IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STAN BEN<br>1164 Anchor Point<br>Del Ray, Florida 33444, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | _____-CV-_____. |
| | : | |
| PHOENIX SERVICES INTERNATIONAL, LLC<br>148 W. State St.<br>Suite 301<br>Kennett Square, PA 19348 | : | |
| | : | |
| -and- | : | |
| | : | |
| METAL SERVICES, LLC<br>t/d/b/a PHOENIX SERVICES<br>148 W. State St.<br>Suite 301<br>Kennett Square, PA 19348 | : | |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Stan Ben ("Mr. Ben") brings this Complaint against defendants Phoenix Services International, Inc. ("Phoenix Services") and Metal Services, LLC d/b/a Phoenix Services ("Metal Services"), collectively, "Defendants," and in support thereof avers as follows:

### Introduction

1. Mr. Ben was an employee of Defendants, having most recently served as president of Europe/South Africa business.

2. Mr. Ben provided notice of his retirement to Defendants on or about September 14, 2016.

3.     In connection with his retirement, Mr. Ben was entitled to, and Defendants were required to pay to Mr. Ben, certain agreed-upon compensation and benefits.

4.     Defendants have failed and refused to pay Mr. Ben what he is owed.

5.     Making matters worse, in an effort to avoid their clear-cut financial obligations to Mr. Ben, Defendants speciously and without factual basis have accused Mr. Ben of breaching alleged duties owed to them.

6.     On account of Defendants' breaches and other wrongful and bad faith conduct, Mr. Ben brings claims against them for breach of contract and violations of Pennsylvania's Wage Payment and Collection Law, codified at 43 Pa.C.S. §§ 260.1 *et seq.* (the "WPCL").

7.     Among other things, Mr. Ben seeks compensatory damages in excess of $780,000.00, in addition to an award of his reasonable attorney's fees costs along with liquidated damages as allowed by the WPCL.

## The Parties

8.     Phoenix Services is, upon information and belief, a Delaware limited liability company with its principal place of business located in Kennett Square, PA.

9.     Metal Services is, upon information and belief, a Delaware limited liability company, with its principal place of business located in Kennett Square, PA.

10.    Mr. Ben is an adult individual who resides in Delray, FL.

## Jurisdiction And Venue

11.    This Court has jurisdiction over this controversy pursuant to 28 U.S.C. § 1332(a) because it involves citizens of different states and an amount in controversy over $75,000.00, exclusive of interest and costs.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants' principal places of business are located in this district and a substantial part of the events or omissions giving rise to Mr. Ben's claims occurred in this district.

## Background

13.     Phoenix Steel is a subsidiary of Metal Services.

14.     Defendants are providers of on-site steel mill services, such as handling and processing of slag, metal recovery and other ancillary services.

15.     Mr. Ben began working for Defendants in 2009, as Senior Vice President of Europe/South Africa business.

16.     On August 15, 2010, in connection with his employment, and pursuant to a Grant of Nonqualified Option (the "2010 Option Agreement"), Phoenix Steel granted to Mr. Ben an option to purchase up to 7,354.53 Phoenix Steel units at the price of $5.86 per unit. See Exhibit A (2010 Option Agreement).

17.     Mr. Ben's rights under the 2010 Option Agreement fully vested as of December 31, 2014.

18.     On December 20, 2011, pursuant to a Grant of Nonqualified Option (the "2011 Option Agreement"), Phoenix Steel granted to Mr. Ben an option to purchase up to 15,000 Phoenix Steel units at the price of $17.90 per unit. See Exhibit B (2011 Option Agreement).

19.     Mr. Ben's rights under the 2011 Option Agreement fully vested as of December 31, 2015.

20.     On May 6, 2014, pursuant to a Grant of Nonqualified Option (the "2014 Option Agreement"), Phoenix Steel granted to Mr. Ben an option to purchase up to 10,000  Phoenix Steel units at the price of $30.68 per unit. See Exhibit C (2014 Option Agreement).

21.    Mr. Ben's rights under the 2014 Option Agreement fully vested as of December 31, 2016.

22.    On or about December 31, 2014, Defendants promoted Mr. Ben to the position of President, Europe/South Africa business.

23.    In connection with this promotion, Defendants, on the one hand, and Mr. Ben, on the other hand, entered into an Employment Agreement dated December 31, 2014 (the "Employment Agreement").  See Exhibit D (Employment Agreement).

24.    Under the Employment Agreement, Mr. Ben was to receive annual non-discretionary performance bonuses as part of his compensation, calculated based on Defendants' and other related entities' performance against budgeted financial metrics.  Mr. Ben's earned (and unpaid) bonus exceeded $150,000.00.

25.    On February 5, 2015, Phoenix Services and Mr. Ben entered into an agreement which allowed Mr. Ben to participate in Phoenix Services' Supplemental Executive Retirement Plan ("SERP").  See Exhibit E (Participation Agreement).

26.    The SERP is an unfunded nonqualified deferred compensation plan maintained primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees, including Mr. Ben.

27.    Under the SERP, Mr. Ben is entitled to be paid $75,000.00 per year for ten (10) years upon retirement.

28.    On March 14, 2016, pursuant to a Grant of Nonqualified Option (the "2016 Option Agreement"), Phoenix Steel granted to Mr. Ben an option to purchase up to 2,000 Phoenix Steel units at the price of $31.18 per unit. See Exhibit F (2016 Option Agreement).

29.    Mr. Ben's rights under the 2016 Option Agreement fully vested as of December

31, 2016.

30.     The 2010 Option Agreement, 2011 Option Agreement, 2014 Option Agreement and 2016 Option Agreement are collectively referred to as the "Option Agreements."

31.     On September 14, 2016, Mr. Ben, having met the criteria for retirement from his position with Defendants, provided written notice that he intended to retire (the "Retirement Notice"). See Exhibit G (Retirement Notice).

32.     Via letter agreement dated On November 22, 2016 (the "Letter Agreement"), Defendants accepted Mr. Ben's Retirement Notice, and Defendants and Mr. Ben reached an agreement as to, among other things, Mr. Ben's retirement date; the vesting and exercise of his Option Agreement; his SERP payments; payments of bonuses and other monies; and other matters related to Mr. Ben's compensation. See Exhibit H (Letter Agreement).

33.     Thereafter, in a letter dated March 9, 2017 (the "March 9th Inquisition Letter"), Defendants (through their legal counsel) accused Mr. Ben of violating certain alleged obligations; demanded that Mr. Ben respond to a series of written queries; and informed Mr. Ben to the effect that unless Defendants were satisfied with his responses, he would receive no compensation or benefits whatsoever in connection with his retirement See Exhibit I (March 9th Inquisition Letter).

34.     Mr. Ben was shocked to receive the March 9th Inquisition Letter, and, prior to receipt of this correspondence, he had enjoyed a close and warm relationship with Defendants.

35.     The March 9th Inquisition Letter was replete with false accusations and disparaging innuendo against Mr. Ben, and was nothing more than a pretextual attempt by Defendants to avoid paying Mr. Ben what he was owed in connection with his retirement.

36.     Nevertheless, five (5) days later, on March 14, 2017, through counsel, Mr. Ben

responded in writing to Defendants' March 9th Inquisition Letter (the "March 14[th] Response"). See Exhibit J (March 14th Response).

37.     Despite receipt of the March 14th Response, Defendants have refused to honor their agreements with Mr. Ben and, without any good faith excuse or justification, have purported to unilaterally terminate these agreements, and all of Mr. Ben's rights thereunder.

38.     Defendants' wrongful conduct constitutes both a breach of contract and an intentional and willful violation of Pennsylvania's WPCL.

### Count I—Breach Of Contract (The Option Agreements)

39.     The foregoing allegations are incorporated by reference as if set forth at length herein.

40.     Defendants and Mr. Ben are parties to an enforceable contract, the Option Agreements.

41.     Mr. Ben performed all obligations (if any) entitling him to purchase the units at the price stated in the Option Agreements.

42.     Mr. Ben is not in breach of the Option Agreements; nor is he in breach of any other agreement with Defendants, or of any duty he may owe to Defendants, contractual or otherwise.

43.     All conditions precedent (if any) necessary to bring this claim have been met.

44.     Defendants ratified and recognized the Option Agreement, and Mr. Ben's rights thereunder, via the Letter Agreement. See Exhibit H.

45.     Defendants breached the Option Agreements by, among other things, refusing to allow Mr. Ben to purchase the units at the price stated in the Option Agreements, and purporting to unilaterally terminate any rights Mr. Ben has under the Option Agreements.

46. As a direct, proximate and reasonably foreseeable consequence of their breaches and other wrongful conduct, Defendants have damaged Mr. Ben in an amount in excess of $75,000.00.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendants on Count I of the Complaint, in an amount in excess of $75,000.00, plus pre-judgment interest and all other relief that the Court deems appropriate.

### Count II—Breach Of Contract (The SERP)

47. The foregoing allegations are incorporated by reference as if set forth at length herein.

48. Defendants and Mr. Ben are parties to an enforceable contract, embodied in the SERP.

49. Mr. Ben performed all obligations (if any) entitling him to benefits pursuant to the SERP.

50. Mr. Ben is not in breach of any obligation under the SERP; nor is he in breach of any other agreement with Defendants, or of any duty he may owe to Defendants, contractual or otherwise.

51. All conditions precedent (if any) necessary to bring this claim have been met.

52. Defendants ratified and recognized the SERP, and Mr. Ben's rights thereunder, via the Letter Agreement. See Exhibit H.

53. Defendants breached the SERP by, among other things, refusing to pay to Mr. Ben the amounts due thereunder, and purporting to unilaterally terminate any rights Mr. Ben has under the SERP.

54.     As a direct, proximate and reasonably foreseeable consequence of their breaches and other wrongful conduct, Defendants have damaged Mr. Ben in an amount in excess of $75,000.00.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendants on Count II of the Complaint, in an amount in excess of $75,000.00, plus pre-judgment interest and all other relief that the Court deems appropriate.

### Count III—Breach Of Contract (The Employment Agreement)

55.     The foregoing allegations are incorporated by reference as if set forth at length herein.

56.     Defendants and Mr. Ben are parties to an enforceable contract, the Employment Agreement.

57.     Mr. Ben performed all obligations (if any) entitling him to benefits pursuant to the Employment Agreement.

58.     Mr. Ben is not in breach of any obligation under the Employment Agreement; nor is he in breach of any other agreement with Defendants, or of any duty he may owe to Defendants, contractual or otherwise.

59.     All conditions precedent (if any) necessary to bring this claim have been met.

60.     Defendants ratified and recognized the Employment Agreement, and Mr. Ben's rights thereunder, via the Letter Agreement.  See Exhibit H.

61.     Defendants breached the Employment Agreement by, among other things, refusing to pay to Mr. Ben the amounts due thereunder, and purporting to unilaterally terminate any rights Mr. Ben has under the Employment Agreement.

62.     As a direct, proximate and reasonably foreseeable consequence of their breaches and other wrongful conduct, Defendants have damaged Mr. Ben in an amount in excess of $75,000.00.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendants on Count III of the Complaint, in an amount in excess of $75,000.00, plus pre-judgment interest and all other relief that the Court deems appropriate.

## COUNT IV—Violations Of Pennsylvania's WPCL

63.     The foregoing allegations are incorporated by reference as if set forth at length herein.

64.     Defendants are employers subject to Pennsylvania's WPCL.

65.     Under the WPCL, Defendants were required to pay to their employee, Mr. Ben, all wages, benefits and other compensation due to him.

66.     There is no good faith contest or dispute as to whether the unpaid wages, benefits and other compensation are due to Mr. Ben.

67.     Defendants owe to Mr. Ben over $780,000.00 in unpaid wages, benefits and other compensation.

68.     The WPCL also entitles Mr. Ben to recovery of liquidated damages in the amount of 25% of any recovery under the statute, along with reasonable attorney's fees and costs incurred by Mr. Ben in prosecuting this action against Defendants.

WHEREFORE, Plaintiff demands judgment in his favor and against Defendants on Count IV of the Complaint, in an amount in excess of $75,000.00, plus pre-judgment interest and all statutory damages, including but not limited to liquidated damages and recover of his

reasonable attorney's fees and costs incurred, along with all other relief that the Court deems appropriate.

### Jury Demand

Mr. Ben demands a trial by jury as to all claims that may be tried to a jury.


KLEHR HARRISON
HARVEY BRANZBURG LLP

Dated:  May 17, 2017                    By:

Lisa A. Lori (Pa. I.D. No.  83814)
William J. Clements (Pa. I.D. No. 86348)
1835 Market Street, 14th Floor
Philadelphia, PA  19103
ph  (215) 569-2700
fax (215) 568-6603
llori@klehr.com
wclements@klehr.com

*Attorneys for Plaintiff,*
*Stan Ben*

# EXHIBIT A



**PHOENIX SERVICES INTERNATIONAL LLC**
1717 WEST DOE RUN ROAD
P O BOX 659
UNIONVILLE, PA  19375

August 15, 2010

Mr. Stan Ben
1164 Anchor Point
Del Ray Beach, FL  33444

       Re:    Phoenix Services International LLC
                 <u>Grant of Nonqualified Option</u>

Dear Stan:

       The Company is pleased to advise you that its Board of Managers has granted to you an option (an "<u>Option</u>"), as provided below, under the Phoenix Services International 2009 Equity Incentive Plan (the "<u>Plan</u>"), a copy of which is attached hereto and incorporated herein by reference.

       1.     <u>Definitions</u>.  For the purposes of this Option Agreement (this "<u>Agreement</u>"), the following terms shall have the meanings set forth below:

       "<u>Base Rate</u>" shall mean, on any date, a variable rate per annum equal to the rate of interest most recently published by <u>The Wall Street Journal</u> as the "prime rate" at large U.S. money center banks.

       "<u>Board</u>" shall mean the Board of Managers of the Company.

       "<u>Cause</u>" means, with respect to you, one or more of the following: (i) the commission of a felony or other crime involving moral turpitude, (ii) the commission of any act or the omission to take any act, either of which results in disloyalty or fraud toward the Company or any of its Subsidiaries, or involving dishonesty in connection with the Company or any of its Subsidiaries which is materially detrimental to the Company or any of its Subsidiaries, (iii) reporting to the workplace under the influence of alcohol or illegal drugs, the use of illegal drugs (whether or not at the workplace) or other repeated conduct causing the Company or any of its Subsidiaries substantial public disgrace or disrepute or substantial economic harm, (iv) substantial and repeated failure to perform duties as reasonably directed by the Board, and such failure is not cured within twenty (20) days after you receive written notice thereof from the Board, (v) any act or omission aiding or abetting a competitor, supplier or customer of the Company or any of its Subsidiaries to the material disadvantage or detriment of the Company and its Subsidiaries, (vi) breach of fiduciary duty, gross negligence or willful misconduct with respect to the Company or any of its Subsidiaries, or (vii) any other material breach of this Agreement or of any other agreement between you and the Company or any of its Subsidiaries.

       "<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended, and any successor statute.

       "<u>Committee</u>" shall have the meaning set forth in the Plan.

"Company" shall mean Phoenix Services International, LLC, a Delaware limited liability company, and (except to the extent the context clearly requires otherwise) any subsidiary of Phoenix Services International.

"Confidential Information" means information, observations and data (including trade secrets) obtained by the Participant during the course of Participant's employment with the Company and its Subsidiaries (including those obtained by him while employed by the Company and its Subsidiaries prior to the date of this Agreement) concerning the business or affairs of the Company or any Subsidiary.

"Disability" shall have the meaning as set forth in Section 409A(a)(2)(c) of the Code.

"EBITDA" shall mean the consolidated earnings of the Company and its Subsidiaries before deductions for interest, taxes, depreciation and non-cash amortization.

"EBITDA Target Amount" means the target amount of EBITDA for each fiscal year ending December 31, 2010 through December 31, 2013 determined annually by the Board, after consultation with members of the Company's senior management team. The Board may adjust EBITDA targets for (i) general market conditions, (ii) new businesses entered or new businesses or assets acquired or (iii) assets sold or businesses exited.

"Fair Market Value" shall have the meaning set forth in the Plan.

"Family Group" means (i) in the case of any individual, such individual's spouse and descendants (by birth or adoption) and any trust solely for the benefit of such individual and/or such individual's spouse and/or such individual's descendants (by birth or adoption), parents or dependents, or any corporation or partnership in which the direct and beneficial owner of all of the equity interest is such individual and/or a member of such individual's Family Group; and (ii) in the case of a trust, the trust's beneficiaries as described in clause (i) above.

"Independent Third Party" means any Person who, immediately prior to the contemplated transaction, does not own directly or indirectly in excess of 5% of the Company's voting equity interests on a fully-diluted basis (a "5% Owner"), who does not control, is not controlled by or under common control with any such 5% Owner and who is not the spouse or descendent (by birth or adoption) of any such 5% Owner or a trust for the benefit of such 5% Owner and/or such other Persons.

"Limited Liability Company Agreement" shall mean that certain Third Amended and Restated Limited Liability Company Agreement, dated as of April 23, 2009, by the members of the Company, as the same may be amended from time to time in accordance with its terms.

"OGF" shall mean OGF AIS Holdings Corp., a Delaware corporation, and its affiliates and successors and assigns.

"Option Units" shall mean (i) all Units issued or issuable upon the exercise of the Option and (ii) all Units issued with respect to the Units referred to in clause (i) above by way of unit dividend or unit split or in connection with any conversion, merger, consolidation, recapitalization or other reorganization affecting the Units. Option Units shall continue to be Option Units in the hands of any holder other than you (except for the Company or OGF and, to the extent that you are permitted to

transfer Option Units pursuant to paragraph 14 hereof, purchasers pursuant to a Public Offering), and each such transferee thereof shall succeed to the rights and obligations of a holder of Option Units hereunder.

"Participant" shall mean the recipient of the Option hereunder.

"Person" shall mean an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Public Offering" means the sale, in an underwritten public offering registered under the 1933 Act, of the equity interests of the Company or any successor entity.

"Public Sale" shall mean any sale of Option Units to the public pursuant to an offering registered under the Securities Act or to the public through a broker, dealer or market maker pursuant to the provisions of Rule 144 adopted under the Securities Act.

"Sale of the Company" shall mean the sale of the Company to an Independent Third Party or group of Independent Third Parties (a) that constitutes a change in (i) the ownership or effective control of the Company or (ii) the ownership of a substantial portion of the Company's assets (as determined by analogy to the provisions of Section 1.409A-3(i)(5)(v), (vi), or (vii) of the Treasury Regulations) and (b) pursuant to which such party or parties acquire (i) all or substantially all of the Company's equity interests (whether by merger, consolidation or sale or transfer of the Company's equity interests) or (ii) all or substantially all of the Company's assets determined on a consolidated basis.

"Securities Act" shall mean the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations.  Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

"Securities Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Exchange Act shall be deemed to include any corresponding provisions of future law.

"Subsidiary" shall mean any entity of which the Company owns securities having a majority of the ordinary voting power in electing the board of directors, board of managers or similar governing body directly or through one or more subsidiaries.

"Total Equity Value" shall mean the aggregate net sale proceeds which would be received by the Company's members if: (i) the assets of the Company as a going concern were sold at their Fair Market Value; (ii) the Company satisfied and paid in full all of its outstanding indebtedness for borrowed money; and (iii) such net sale proceeds were then distributed in accordance with the Limited Liability Company Agreement (or similar governing document) as then in effect, all as determined in good faith by the Board.  When determined in connection with a Sale of the Company, Total Equity Value shall be derived from the consideration paid in connection with such Sale of the Company.

---

PHOENIX SERVICES INTERNATIONAL LLC

"Unit" shall have the meaning set forth in the Plan.

"Work Product" means discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports, patent applications, copyrightable work and mask work (whether or not including any confidential information) and all registrations or applications related thereto, all other proprietary information and all similar or related information (whether or not patentable) which relate to the Company's or any of its Subsidiaries' actual or anticipated business, research and development or existing or future products or services and which are conceived, developed or made by you (whether alone or jointly with others) while employed by the Company or its predecessor and its Subsidiaries, whether before or after the date of this Agreement.

2. Option.

(a) Terms. Your Option is for the purchase of up to 7354.53 Units at a price per unit of $5.86 (the "Exercise Price"), payable upon exercise as set forth in paragraph 2(b) below. The Exercise Price of your Option is equal to the Fair Market Value of the underlying Units on the date of this Agreement. Your Option shall expire at the close of business on the tenth anniversary of the date hereof (the "Expiration Date"), subject to earlier expiration as provided in paragraphs 3(c) and 4 below. Your Option is not intended to be an "incentive stock option" within the meaning of Section 422 of the Code.

(b) Payment of Option Price. Subject to paragraph 4 below, your Option may be exercised in whole or in part upon payment of an amount (the "Option Price") equal to the product of (i) the Exercise Price multiplied by (ii) the number of Option Units to be acquired. Payment shall be made in cash (including check, bank draft or money order).

3. Vesting.

(a) Normal Vesting. Except as otherwise provided in paragraphs 3(b), 3(c) and 3(d) below, your Option shall vest in accordance with the following schedule, if (i) the Company's EBITDA meets the applicable EBITDA Target Amount as of such fiscal year end, and (ii) if as of each such date you are, and have been since the date hereof, employed by the Company or any of its Subsidiaries:

| Date | Annual Percentage of Option Vested |
|---|---|
| Company's fiscal year ending on or around December 31, 2010 | 20% |
| Company's fiscal year ending on or around December 31, 2011 | 20% |
| Company's fiscal year ending on or around December 31, 2012 | 20% |
| Company's fiscal year ending on or around December 31, 2013 | 20% |
| Company's fiscal year ending on or around December 31, 2014 | 20% |

(b) To the extent the EBITDA Target Amount is not achieved in a certain fiscal year (a "Missed Fiscal Year"), if the Company's EBITDA in a subsequent fiscal year (through and including the last fiscal year) is at least equal to the EBITDA Target Amount for such fiscal year (an "Achieved Fiscal Year"), then for each Missed Fiscal Year, if Company's aggregate EBITDA for such Missed Fiscal Year and all subsequent fiscal years (up to and including the Achieved Fiscal Year) is at least equal to the sum of the EBITDA Target Amounts for such fiscal years, then the percentage of your Option that will be vested for achieving the Achieved Fiscal Year shall include the percentage of your Option for such

PHOENIX SERVICES INTERNATIONAL LLC

Missed Fiscal Year. If the percentage of your Option for any Missed Fiscal Year is vested in accordance with this paragraph 3(b), such fiscal year shall no longer be deemed to be a Missed Fiscal Year. Notwithstanding anything set forth herein to the contrary, in no event shall the aggregate amount of your Option to be vested exceed the amount of Units subject to the Option granted hereunder.

(c)     The portion of your Option which has become vested are referred to herein as "Vested Options" and all other portions of your Option are referred to herein as "Unvested Options." Any Unvested Options held by you at the time of a Sale of the Company (excluding the Unvested Options that shall become Vested Options in connection with such Sale of the Company in accordance with this paragraph 3(c)) shall expire and be forfeited, unless otherwise determined by the Committee or the Board in its sole discretion. All Unvested Options held by you at the time of a Public Offering shall remain outstanding and be subject to the original vesting schedule set forth in paragraph 2(a) above.

(d)     Notwithstanding anything herein to the contrary, the Board may, in its sole discretion, accelerate the vesting of all or any portion of your Option at any time.

4.     Exercisability/Expiration of Option.

(a)     Your Option may be exercised in accordance with paragraph 5 only to the extent it has become vested pursuant to paragraph 3 above and has not expired and been forfeited pursuant to paragraph 4(b) below, and then only upon the earliest to occur of (a) the consummation of a Sale of the Company, (b) a Public Offering, (c) the date you become subject to any Disability, (d) the date of your death, (e) the date your employment with the Company terminates other than as the result of (i) the termination of your employment for Cause or (ii) your resignation, and (f) the Expiration Date.

(b)     Your Option shall expire and be forfeited to the extent that you do not exercise it on or before the earlier of (i) March 15 of the calendar year immediately following the calendar year in which the earliest of the events or dates set forth in paragraph 4(a) above occurs and (ii) the Expiration Date. Any portion of your Option that is not vested as of the date your employment with the Company terminates for any reason shall expire and be forfeited on such date and the number of Option Units with respect to which your Option may be exercised shall not increase once you cease to be employed by the Company. Your Option shall expire and be forfeited in its entirety (i) on the date your employment is terminated by reason of your resignation, (ii) on the date your employment is terminated for Cause at any time, or (iii) immediately following a Sale of the Company to the extent you do not exercise your Option on (or, if your Option previously became exercisable, prior to) the date of the Sale of the Company.

5.     Procedure for Exercise. You may exercise all or any portion of your Option, to the extent it has vested pursuant to paragraph 3 above and is exercisable pursuant to paragraph 4 above, at any time and from time to time prior to its expiration, by delivering written notice to the Company (to the attention of the Company's Secretary) and your written acknowledgement that you have reviewed and have been afforded an opportunity to ask questions of management of the Company with respect to all financial and other information provided to you regarding the Company, together with payment of the Option Price in accordance with the provisions of paragraph 2(b) above. As a condition to any exercise of your Option, you shall (a) permit the Company to deliver to you all financial and other information regarding the Company it believes necessary to enable you to make an

informed investment decision, (b) make all customary investment representations which the Company requires and (c) execute and deliver a joinder to the Limited Liability Company Agreement and thereby become a "Member" and a holder of "Management Units" thereunder.

6.      Securities Laws Restrictions and Other Restrictions on Transfer of Option Units. You represent and warrant that when you exercise your Option you shall be purchasing Option Units for your own account and not on behalf of others.  You understand and acknowledge that federal and state securities laws govern and restrict your right to offer, sell or otherwise dispose of any Option Units unless your offer, sale or other disposition thereof is registered or qualified under the Securities Act and applicable state securities laws, or in the opinion of the Company's counsel, such offer, sale or other disposition is exempt from registration or qualification thereunder.  You agree that you shall not offer, sell or otherwise dispose of any Option Units in any manner which would: (i) require the Company to file any registration statement with the Securities and Exchange Commission (or any similar filing under state law) or to amend or supplement any such filing or (ii) violate or cause the Company to violate the Securities Act, the rules and regulations promulgated thereunder or any other state or federal law.  You further understand that the certificates for any Option Units you purchase shall bear such legends as the Company deems necessary or desirable in connection with the Securities Act or other rules, regulations or laws.

7.      Non-Transferability of Option.  Your Option is personal to you and is not transferable by you other than by will or the laws of descent and distribution.  During your lifetime only you (or your guardian or legal representative) may exercise your Option.  In the event of your death, your Option may be exercised only (i) by the executor or administrator of your estate or the person or persons to whom your rights under the Option shall pass by will or the laws of descent and distribution and (ii) to the extent that you were entitled to so exercise hereunder at the date of your death.

8.      Conformity with Plan.  Your Option is intended to conform in all respects with, and is subject to all applicable provisions of, the Plan (which is incorporated herein by reference). Inconsistencies between this Agreement and the Plan shall be resolved in accordance with the terms of the Plan.  By executing and returning the enclosed copy of this Agreement, you acknowledge your receipt of this Agreement and the Plan and agree to be legally bound by all of the terms of this Agreement and the Plan.

9.      Rights of Participants.  Nothing in this Agreement shall interfere with or limit in any way the right of the Company to terminate your employment at any time (with or without Cause), nor confer upon you any right to continue in the employ of the Company for any period of time or to continue your present (or any other) rate of compensation, and in the event of your termination of employment (including, but not limited to, termination by the Company without Cause), any portion of your Option that was not previously vested and exercisable shall automatically expire and be forfeited. Nothing in this Agreement shall confer upon you any right to be selected again as a Plan participant, and nothing in the Plan or this Agreement shall provide for any adjustment to the number of Option Units subject to your Option upon the occurrence of subsequent events except as provided in paragraph 11 below.  Prior to your exercise of your Option and the delivery to you of the Units represented thereby, you shall not have any rights as a holder of Units with respect to any Units covered by such Option (including any liquidation, redemption, dividend or voting rights).

10.     Withholding of Taxes.  The Company shall be entitled, if necessary or desirable, to withhold from you from any amounts due and payable by the Company to you (or secure payment from you in lieu of withholding) the amount of any minimum statutory withholding with respect to any Option Units issued or issuable under this Plan, and the Company may defer such issuance unless indemnified by you to its satisfaction.

11.     Adjustments.  In the event of a reorganization, recapitalization, unit dividend or unit split, or combination or other change in the Units or any merger, consolidation or exchange of Units, the Board or the Committee may make such adjustments in the number and type of units authorized by the Plan, the number and type of units covered by your Option (including the issuer thereof in the case of a merger, consolidation or exchange in which the surviving entity or a parent thereof assumes or replaces all or a portion of the outstanding Options) and the Exercise Price specified herein as may be determined to be appropriate and equitable, in order to prevent the dilution or enlargement of rights under your Option. The issuance by the Company of units of any class, or options or securities exercisable or convertible into units of any class, for cash or property, or for labor or services either upon direct sale, or upon the exercise of rights or warrants to subscribe therefor, or upon exercise or conversion of other securities, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number or price of Units then subject to any Options.

12.     Right to Purchase Option Units Upon Your Termination of Employment.

(a)     Repurchase of Option Units.  If (i) your employment with the Company shall terminate (the "Termination") for any reason (or no reason), including upon your death, Disability, resignation or termination with or without Cause (the date on which such termination occurs being referred to as the "Termination Date"), or (ii) you violate any agreement between you and the Company with respect to non-solicitation, confidentiality, protection of trade secrets or the like, whether prior at subsequent to Termination of your employment with the Company, then, in any such case, the Company (or its designees) shall have the option to repurchase all or any part of the Option Units issued or issuable upon exercise of your Option, whether held by you or by one or more of your transferees, at the price determined in accordance with the provisions of paragraph 13 hereof (the "Repurchase Option").

(b)     Repurchase by Company.  The Company (or its designee) may elect to purchase all or any portion of the Option Units by delivery of written notice (the "Repurchase Notice") to you or any other holders of your Option Units (i) with respect to a repurchase right arising out of clause (i) of paragraph 12(a) above, within  six months after the Termination Date for any Option Units issued at least six months and one day prior to such Termination Date (or in the case of Option Units issued six months or less prior to such Termination Date or at any time after such Termination Date, no earlier than six months and one day and no later than nine months after the date of the issuance of such Option Units), or (ii) with respect to a repurchase right arising out of clause (ii) of paragraph 12(a) above, within six months after the date such non-solicitation, confidentiality, protection of trade secret or similar provision expires (the period referred to in the foregoing  clause (i) and (ii), as applicable,  the "Repurchase Notice Period").  The Repurchase Notice shall set forth the number of Option Units to be acquired from you and such other holder(s), the aggregate consideration to be paid for such Option Units and the time and place for the closing of the transaction. The number of Option Units to be repurchased by the Company shall first be satisfied to the extent possible from the Option Units held by you at the time of delivery of the Repurchase Notice. If the number of Option Units then held by you is less than the total number of Option Units the Company has elected to purchase, then

the Company shall purchase the remaining Option Units elected to be purchased from the other holders thereof, pro rata according to the number of Option Units held by each such holder at the time of delivery of such Repurchase Notice (determined as close as practical to the nearest whole Unit). The Company may assign its rights set forth in this paragraph 12 to any Person.

(c)     <u>Repurchase by Investors</u>.  If for any reason the Company does not elect to purchase all of the Option Units pursuant to the Repurchase Option, then OGF (or any designees thereof) shall be entitled to exercise the Company's Repurchase Option in the manner set forth in paragraph 12(a) for all or any portion of the number of Option Units the Company has not elected to purchase (the "<u>Available Units</u>").  As soon as practicable after the Company has determined that there shall be Available Units, but in any event within 45 days prior to the expiration of the Repurchase Notice Period referred to in paragraph 12(b) above, the Company shall deliver written notice (the "<u>Option Notice</u>") to OGF setting forth the number of Available Units and the price for each Available Unit. Notwithstanding any provision to the contrary, OGF shall not be permitted to exercise the Company's Repurchase Option until and to the extent that such Repurchase Option becomes exercisable by the Company pursuant to paragraph 12(b) above.  OGF may elect to purchase any number of Available Units by delivering written notice to the Company within 30 days after receipt of the Option Notice from the Company.  As soon as practicable, and in any event within five days after the expiration of such 30-day period, the Company shall notify you and any other holder(s) of Option Units as to the number of Option Units being purchased from you by OGF (the "<u>Supplemental Repurchase Notice</u>").  At the time the Company delivers the Supplemental Repurchase Notice to you, the Company shall also deliver written notice to OGF setting forth the number of Units OGF is entitled to purchase, the aggregate purchase price and the time and place of the closing of the transaction.  OGF may assign its rights set forth in this paragraph 12 to any Persons.

(d)     <u>Closing of Repurchase of Option Units</u>.  The closing of the purchase of Option Units pursuant to this paragraph 12 shall take place on the date designated by the Company in the Repurchase Notice or Supplemental Repurchase Notice, as the case may be, which date shall not be more than 60 days nor less than five days after the delivery of the later of either such notice to be delivered.  At the closing, the purchaser or purchasers shall pay the purchase price in the manner specified in paragraph 13(b) and you and any other holders of Option Units being purchased shall deliver the certificate or certificates representing such Option Units to the purchaser or purchasers or their nominees, accompanied by duly executed unit powers.  Any purchaser of Option Units under this paragraph 12 shall be entitled to (i) receive customary representations and warranties from you and any other selling holders of Option Units regarding the sale of such Option Units (including representations and warranties regarding good title to such Option Units, free and clear of any liens or encumbrances) and (ii) require that signatures be guaranteed by a national bank or reputable securities broker.

(e)     <u>Deemed Repurchase</u>.  Upon delivery of the Repurchase Notice or Supplemental Repurchase Notice, as applicable, then from and after such time, the holder of such Option Units from whom such securities are to be purchased shall cease to have any rights as a holder of such securities (other than the right to receive payment of such consideration in accordance with paragraph 13 below), and such securities shall be deemed purchased in accordance with the applicable provisions hereof and the purchaser thereof shall be deemed the owner (of record and beneficially) and holder(s) of such securities, whether or not the certificate representing such Option Units has been delivered as required by this Agreement.

PHOENIX SERVICES INTERNATIONAL LLC

(f)   Revocation of Election.   Any election by the Company or OGF (or any of their designees) to purchase Option Units pursuant to this paragraph 12 shall be revocable by such Person (with respect to all or any portion of the Option Units elected to be purchased) at any time prior to the closing of such purchase, without any liability whatsoever to such Person in respect of the rights and obligations in this paragraph 12.

13.   Purchase Price for Option Units.

(a)   Purchase Price.   In the event that (i) your Termination is effected by a termination of your employment for Cause or (ii) prior to the consummation of any repurchase, you violate any agreement between you and the Company with respect to non-solicitation, confidentiality, protection of trade secrets or the like, the purchase price for each Option Unit shall be the lesser of (1) the exercise price paid by you for such Option Unit and (2) the Fair Market Value thereof as of the Termination Date.   Other than as described in the preceding sentence, the purchase price for each Option Unit shall be the Fair Market Value thereof as of the Termination Date; provided, however, that if you receive a repurchase price per Option Unit equal to the Fair Market Value thereof pursuant to this sentence but subsequently violate any agreement between you and the Company with respect to non-solicitation, confidentiality, protection of trade secrets or the like, then you shall immediately remit a cash payment to the Company equal in amount to the positive difference, if applicable, between the Fair Market Value received by you per each such Option Unit and the corresponding exercise price paid by you for each such Option Unit.

(b)   Manner of Payment.   If the Company elects to purchase all or any part of the Option Units, including Option Units held by one or more transferees, the Company shall pay for such Option Units by certified check or wire transfer of funds to the extent such payment would not cause the Company to violate the General Corporation Law of the State of Delaware and would not cause the Company to breach any agreement to which it is a party relating to the indebtedness for borrowed money or other material agreement (including any restricted payment covenant prohibiting direct or indirect distributions to the Company in order to effectuate such repurchase) (each such restriction, a "Restrictive Covenant").   If any such Restrictive Covenants prohibit the repurchase of Option Units hereunder which the Company is otherwise entitled to make, the time periods provided in this paragraph 13 shall be suspended, and the Company may make such repurchases as soon as it is permitted to do so under such restrictions.   In addition, if any such Restrictive Covenant prohibits the repurchase of Option Units hereunder with a cashier's or certified check or wire transfer of funds, then the Company may make such repurchase of Option Units with a three-year junior subordinated note payable on maturity bearing interest (payable at maturity) at a simple rate per annum equal to the Base Rate (a "Junior Subordinated Note").   Any Junior Subordinated Note issued by the Company pursuant to this paragraph 13(b) shall be subject to any Restrictive Covenants and any subordination provisions required by the Company's senior and subordinated lenders and may be prepaid without premium or penalty at the election of the Company to the extent permitted by the Company's loan agreements and related documents with the Company's senior and subordinated lenders.   In addition, the Company may pay the purchase price for such Option Units by offsetting amounts outstanding under any indebtedness or obligations owed by you to the Company.   If OGF (or its designees) elects to purchase all or any portion of the Available Units, OGF (or its designees) shall pay for that portion of such Option Units by certified check or wire transfer of funds.

---

14.    <u>Restrictions on Transfer</u>.

(a)    <u>Transfer of Option Units</u>.  You shall not sell, pledge or otherwise transfer any interest in any Option Units except pursuant to a Public Sale or the provisions of paragraph 12 hereof or as otherwise permitted pursuant to the terms of the Limited Liability Company Agreement ("<u>Exempt Transfers</u>") and except pursuant to the provisions of this paragraph 14.  Prior to transferring any interest in any Option Units (other than a Public Sale) to any Person, you shall cause the prospective transferee to be bound by this Agreement and to execute and deliver to the Company and OGF a counterpart of this Agreement.

(b)    <u>Termination of Restrictions</u>.  The restrictions on the transfer of Option Units set forth in this paragraph 14 shall terminate when the Company has sold Units pursuant to a Public Offering.

15.  <u>Confidential Information</u>.   You acknowledge that the Confidential Information is the property of the Company or such Subsidiary.  Therefore, you agree that you shall not disclose to any person or entity or use for any purpose (other than for the benefit of the Company and its Subsidiaries) any Confidential Information or any confidential or proprietary information of other persons or entities in the possession of the Company and its Subsidiaries ("<u>Third Party Information</u>"), without the prior written consent of the Board, unless and to the extent that the Confidential Information or Third Party Information becomes generally known to and available for use by the public other than as a result of your acts or omissions.  You shall deliver to the Company at the termination or expiration of the Employment Period (as defined below), or at any other time the Company may request, all memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documents and data (and copies thereof) embodying or relating to the Confidential Information, Work Product or the business of the Company or any Subsidiary which you may then possess or have under your control.

16.    <u>Non-Compete; Non-Solicitation</u>.

(a)    You hereby acknowledges that, during the course of your employment with the Company you have and shall become familiar with the Company's and its Subsidiaries' trade secrets and other Confidential Information. You acknowledge and agree that the Company and its Subsidiaries would be irreparably damaged if you were to provide services to or otherwise participate in the business of any person or entity competing with the Company or its Subsidiaries or providing services similar to those of the Company and its Subsidiaries and that any such competition or provision of services by you would result in a significant loss of goodwill by the Company and its Subsidiaries. You further acknowledge and agree that the covenants and agreements set forth in this paragraph 16 were a material inducement to the Company to enter into this Agreement and to perform its obligations hereunder, and that the Company would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the parties hereto if you breached the provisions of this paragraph 16. Therefore, you agree that, during the term of your employment with the Company and its Subsidiaries (the "<u>Employment Period</u>") and for 12 months thereafter (the "<u>Noncompete Period</u>"), you shall not directly or indirectly own any interest in, manage, control, participate in (whether as an officer, director, employee, partner, agent, representative or otherwise), consult with, render services for, or in any other manner engage in any business competing with the businesses of the Company or its Subsidiaries, as such businesses exist or are or were in the process of being developed during the Employment Period within any geographical area in which the Company or its Subsidiaries engage or plan to engage in such businesses.  Nothing herein shall prohibit you from being a passive owner of not

more than 2% of the outstanding stock of any class of a corporation which is publicly traded so long as you do not have any active participation in the business of such corporation.

(b)     During the Noncompete Period, you shall not directly or indirectly through another person or entity (i) induce or attempt to induce any employee of the Company or any Subsidiary to leave the employ of the Company or such Subsidiary, or in any way interfere with the relationship between the Company or any Subsidiary and any employee thereof, (ii) hire any person who was an employee of the Company or any Subsidiary at any time during the six month period prior to the date of hire, (iii) call on, solicit, or service any customer, supplier, licensee, licensor or other business relation or prospective client of the Company or any of its Subsidiaries with respect to products and/or services that are or have been provided by the Company or such Subsidiary during the twelve-month period prior to the termination of the Employment Period, or which the Company or any of its Subsidiaries is currently in the process of developing or (iv) induce or attempt to induce any customer, supplier, licensee, licensor, franchisee or other business relation of the Company or any Subsidiary to cease doing (or reduce its) business with the Company or such Subsidiary, or in any way interfere with the relationship between any such customer, supplier, licensee or business relation and the Company or any Subsidiary (including, without limitation, making any negative or disparaging statements or communications regarding the Company or its Subsidiaries).

(c)     In addition to the other remedies available hereunder, in the event of a breach or violation by you of this paragraph 16, the Noncompete Period shall be automatically extended by the amount of time between the initial occurrence of the breach or violation and when such breach or violation has been duly cured. You acknowledge that the restrictions contained in this paragraph 16 are reasonable and that you have reviewed the provisions of this Agreement with your legal counsel. You acknowledge and agree that the covenants contained in this paragraph 16 are in addition to, rather than in lieu of, any similar or related covenants to which you are a party or by which you are bound.

(d)     You agree that you shall not, at any time, whether during or after you cease to provide services to the Company or any of its Subsidiaries, make or publish any untruthful statement (orally or in writing) that intentionally libels, slanders, disparages or otherwise defaces the goodwill or reputation (whether or not such disparagement legally constitutes libel or slander) of the Company, any Subsidiary or any of their affiliates, or its other officers, managers, directors, partners or investment professionals.  You acknowledges that you, as part of his employment, are responsible for preserving the goodwill or reputation of the aforementioned parties.

17.     <u>Additional Restrictions on Transfer.</u>

(a)     <u>Restrictive Legend.</u>  The certificates representing the Option Units shall bear the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON _____, 20____, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>"), OR UNDER ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION FROM REGISTRATION THEREUNDER.  THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER, CERTAIN REPURCHASE OPTIONS AND CERTAIN OTHER AGREEMENTS SET FORTH IN AN

OPTION AGREEMENT BETWEEN THE COMPANY AND [_____], DATED AS OF [_____, 20__], A COPY OF WHICH MAY BE OBTAINED BY THE HOLDER HEREOF AT THE COMPANY'S PRINCIPAL PLACE OF BUSINESS WITHOUT CHARGE."

(b)    Opinion of Counsel.  You may not sell, transfer or dispose of any Option Units (except pursuant to an effective registration statement under the Securities Act) without first delivering to the Company an opinion of counsel reasonably acceptable in form and substance to the Company that registration under the Securities Act or any applicable state securities law is not required in connection with such transfer.

(c)    Holdback.  You agree not to effect any public sale or distribution of any equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, during the seven days prior to and the 180 days after the effectiveness of any Public Offering, except as part of such Public Offering if otherwise permitted by the Company.

18.    Management Units.  You acknowledge and agree that your Option Units shall be deemed to be Management Units for all purposes of the Limited Liability Company Agreement (including Article 15) and, as such, shall be subject to the provisions thereof.

19.    Remedies.   The parties hereto (and OGF as a third-party beneficiary) acknowledge and agree that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that the parties hereto (and OGF as a third-party beneficiary) shall be entitled to specific performance and/or injunctive relief (without posting bond or other security) from any court of law or equity of competent jurisdiction in order to enforce or prevent any violation of the provisions of this Agreement.

20.    Amendment.  Except as otherwise provided herein and notwithstanding anything to the contrary in the Plan, any provision of this Agreement may be amended or waived only with the prior written consent of the Company and the Plan participants who have been granted options to purchase a majority of the options under the Plan (based on the number of underlying Option Units issuable upon the exercise of all such options) theretofore granted under the Plan (unless you will be treated in a manner materially different from other Plan participants, in which case your individual written consent will also be required); provided that no provision of paragraphs 12 through this paragraph 20 may be amended or waived without the prior written consent of OGF. Notwithstanding any other provisions of the Plan, and in addition to the powers of amendment and modification set forth herein, the provisions hereof and the provisions of any Option granted hereunder may be amended unilaterally by the Committee from time to time (but shall have no obligation to do so) to the extent necessary (and only to the extent necessary) to prevent the implementation, application or existence (as the case may be) of any such provision from causing any Option granted hereunder to be treated as providing for the deferral of compensation pursuant to Code §409A subject to federal income tax by reason of Code §409A(a)(1)(A).

21.    Successors and Assigns.  Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns.

22.    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this

12 |

Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

23.     Counterparts. This Agreement may be executed in one or more counterparts (including by means of telecopied signature pages), each of which shall be an original and all of which taken together shall constitute one and the same agreement.

24.     Descriptive Headings. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

25.     Governing Law. All issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

26.     Notices. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when personally delivered, sent by telecopy (with receipt confirmed) on a business day during regular business hours of the recipient (or, if not, on the next succeeding business day) or one business day after sent by reputable overnight express courier (charges prepaid). Such notices, demands and other communications shall be sent to you and to the Company and OGF at the addresses listed below:

If to the Participant:

[_____]
[_____]

If to the Company:

Atlas Industrial Services LLC
[Address]
Attn:   Chief Executive Officer
Telecopy: [_____]

<u>With   a   copy   to   (which   shall   not   constitute   notice   to   the   Company)</u>:

OGF AIS Holdings Corp.
c/o Olympus Growth Fund V, L.P.
Metro center, One Station Place
Stamford, CT 06902
Telephone:  (203) 353-5900
Facsimile: (203) 353-5910
Attn:   L. David Cardenas
        Sean P. Whiteley


Kirkland & Ellis LLP
300 N. LaSalle St.
Chicago, Illinois 60654
Attn:   John A. Schoenfeld, P.C.
        Roger D. Rhoten
Telephone:   (312) 862-2000
Telecopy:    (312) 862-2200


<u>If to OGF</u>:

OGF AIS Holdings Corp.
c/o Olympus Growth Fund V, L.P.
Metro center, One Station Place
Stamford, CT 06902
Telephone: (203) 353-5900
Facsimile: (203) 353-5910
Attn:   L. David Cardenas
        Sean P. Whiteley

<u>With a copy to (which shall not constitute notice to OGF)</u>:

Kirkland & Ellis LLP
300 N. LaSalle St.
Chicago, Illinois 60654
Attn:   John A. Schoenfeld, P.C.
        Roger D. Rhoten
Telephone:   (312) 862-2000
Telecopy:    (312) 862-2200

or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

27.    <u>Third-Party Beneficiary</u>.  The Company and you acknowledge that OGF is a third-party beneficiary under this Agreement.

PHOENIX SERVICES INTERNATIONAL LLC

28.    Entire Agreement.   Except as otherwise expressly set forth herein, this Agreement and the Plan embody the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.  If there are any conflicts in terms and conditions between this Agreement and the Plan, the terms and conditions of the Plan shall govern, unless otherwise determined by the Committee or the Board.

29.    Rule 701 Compensation.   The Company and you acknowledge and agree that this Agreement has been executed and delivered, and the Option has been granted hereunder, in connection with and as a part of the compensation and incentive arrangements between the Company and you and not as part of a capital raising effort of the Company.  The grant of the Option hereunder and any issuance of Option Units upon the exercise of the Option are intended to qualify as an exempt offering under Rule 701 of the Securities Act.

30.    Code Section 280G.   Notwithstanding any provision of this Agreement to the contrary, if all or any portion of the payments or benefits received or realized by you pursuant to this Agreement either alone or together with other payments or benefits which you receive or realize or are then entitled to receive or realize from the Company or any of its affiliates would constitute a "parachute payment" within the meaning of Section 280G of the Code and the regulations promulgated thereunder or any corresponding and applicable state law provision, such payments or benefits provided to you shall be reduced by reducing the amount of payments or benefits payable to you pursuant to paragraphs 3 and 4 of this Agreement to the extent necessary so that no portion of such payments or benefits shall be subject to the excise tax imposed by Section 4999 of the Code and any corresponding and/or applicable state law provision; provided that such reduction shall only be made if, by reason of such reduction, your net after tax benefit shall exceed the net after tax benefit if such reduction were not made.  For purposes of this paragraph, "net after tax benefit" shall mean the sum of (i) the total amount received or realized by you pursuant to this Agreement that would (in the absence of any reduction contemplated by this paragraph 30) constitute a "parachute payment" within the meaning of Section 280G of the Code and any corresponding and applicable state law provision, plus (ii) any other payments or benefits which you receive or realize or are then entitled to receive or realize from the Company and any of its affiliates that would (in the absence of any reduction contemplated by this paragraph 30) constitute a "parachute payment" within the meaning of Section 280G of the Code and any corresponding and applicable state law provision, less (iii) the amount of federal or state income taxes payable with respect to the payments or benefits described in (i) and (ii) above calculated at the maximum marginal individual income tax rate for each year in which payments or benefits shall be realized by you (based upon the rate in effect for such year as set forth in the Code, and any corresponding applicable state law provisions at the time of the first receipt or realization of the foregoing), less (iv) the amount of excise taxes imposed with respect to the payments or benefits described in (i) and (ii) above by Section 4999 of the Code and any corresponding and applicable state law provision.

31.    Code Section 409A.

(a)    The Options issued hereunder are intended to qualify as an arrangement that does not constitute "deferred compensation" for purposes of Code §409A(a) by reason of the exception for "short-term deferrals" set forth in Section 1.409A-1(b)(4) of the Treasury Regulations (except that any "transaction-based" payments to which you become entitled pursuant to paragraph 32(b) below

---

are intended to constitute deferred compensation that is not subject to federal income tax pursuant to Code §409A(a)(1)(A), and the terms of this Agreement shall be interpreted in a manner consistent with such intention. However, neither the Company nor any of its affiliates makes any representations with respect to the application of Code §409A to the Options and, by the acceptance of the Options, the Participant agrees to accept the potential application of Code §409A to the Options and the other tax consequences of the issuance, vesting, ownership, modification, adjustment, and disposition of the Options. The Participant agrees to hold harmless and indemnify the Company and its affiliates from any adverse tax consequences to the Participant with respect to the Options, any withholding or other tax obligations of the Company or its affiliates with respect to the Options, and from any action or inaction or omission of the Company or its affiliates pursuant to the Plan or otherwise that may cause such Options to be or become subject to federal income tax pursuant to Code §409A(a)(1)(A).

(b)     To the extent that you exercise your Options in connection with the Sale of the Company and, a consequence thereof, would (in the absence of this paragraph 32(b)) become entitled to one or more payments after the date such Sale of the Company that are treated as compensation for federal income tax purposes ("transaction-based compensation"), then you shall be entitled to receive such transaction based compensation only to the extent (a) it is paid on the same schedule and under the same terms and conditions (i) as apply to payments to holders of Company Units generally with respect to such Units pursuant to a Sale of the Company structured as a sale of Units that meets the requirements of Section 1.409A-3(i)(5)(v) of the Treasury Regulations or (ii) as apply to payments to the Company pursuant to a sale of the Company's assets that meets the requirements of Section 1.409A-3(i)(5)(vii) of the Treasury Regulations, and (b) the transaction-based compensation is paid not later than five years after the date the Sale of the Company is consummated. Each such payment shall be deemed to be a separate payment for purposes of Code §409A.

(c)     For purposes of this Agreement, "termination of employment," "cease to be employed" or similar phrases shall have the meaning for "termination of employment" set forth in the first sentence of Section 1.409A-1(h)(i)(ii) of the Treasury Regulations.

32.     No Strict Construction.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

33.     Further Assurances.  At any time or from time to time after the date hereof, the parties agree to cooperate with each other, and at the request of any other party, to execute and deliver any further instruments or documents and to take all such further action as the other party may reasonably request in order to evidence or effectuate the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the parties hereunder.

34.     Business Days.  If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the state in which the Company's chief executive office is located, the time period shall automatically be extended to the business day immediately following such Saturday, Sunday or legal holiday.

35.     Delivery by Facsimile.  This Agreement and any signed agreement or instrument entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto,

to the extent signed and delivered by means of a facsimile machine, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine as a defense to the formation of a contract and each such party forever waives any such defense.

* * * * *

PHOENIX SERVICES INTERNATIONAL LLC

Please execute the extra copy of this Option Agreement in the space below and return it to the Company's Secretary at its executive offices to confirm your understanding and acceptance of the agreements contained in this Option Agreement.

Very truly yours,

PHOENIX SERVICES INTERNATIONAL, LLC

By: _____

Name:  R. Douglas Lane
Title:    President

Enclosures:    (1)    Extra copy of this Option Agreement
               (2)    Copy of the Plan

The undersigned hereby acknowledges having read this Option Agreement and the Plan and hereby agrees to be bound by all provisions set forth herein and in the Plan.

Dated as of [_____, 20___]          PARTICIPANT

_____

Name:  Stan Ben

## CONSENT

The undersigned spouse of Stan Ben hereby acknowledges that I have read the foregoing Option Agreement and that I understand its contents. I am aware that the Option Agreement provides for the repurchase of my spouse's Option Units under certain circumstances and imposes other restrictions on the transfer of such Option Units. I agree that my spouse's interest in the Option Units is subject to this Option Agreement and any interest I may have in such Option Units shall be irrevocably bound by this Option Agreement and further that my community property interest, if any, shall be similarly bound by this Option Agreement. I am aware that the legal, financial and other matters contained in this Option Agreement are complex and I am free to seek advice with respect thereto from independent counsel. I have either sought such advice or determined after carefully reviewing this Option Agreement that I will waive such right.

_____
Spouse

_____
Witness

# EXHIBIT B



**PHOENIX SERVICES INTERNATIONAL LLC**
148 West State Street
Suite # 301
Kennett Square, PA 19348

December 20, 2011

Mr. Stan Ben
1164 Anchor Point
Del Ray Beach, FL 33444

Re:   Phoenix Services International LLC
      <u>Grant of Nonqualified Option</u>

Dear Stan:

The Company is pleased to advise you that its Board of Managers has granted to you an option (an "<u>Option</u>"), as provided below, under the Phoenix Services International 2009 Equity Incentive Plan (the "<u>Plan</u>"), a copy of which is attached hereto and incorporated herein by reference.

1.    <u>Definitions</u>.  For the purposes of this Option Agreement (this "<u>Agreement</u>"), the following terms shall have the meanings set forth below:

"<u>Base Rate</u>" shall mean, on any date, a variable rate per annum equal to the rate of interest most recently published by <u>The Wall Street Journal</u> as the "prime rate" at large U.S. money center banks.

"<u>Board</u>" shall mean the Board of Managers of the Company.

"<u>Cause</u>" means, with respect to you, one or more of the following: (i) the commission of a felony or other crime involving moral turpitude, (ii) the commission of any act or the omission to take any act, either of which results in disloyalty or fraud toward the Company or any of its Subsidiaries, or involving dishonesty in connection with the Company or any of its Subsidiaries which is materially detrimental to the Company or any of its Subsidiaries, (iii) reporting to the workplace under the influence of alcohol or illegal drugs, the use of illegal drugs (whether or not at the workplace) or other repeated conduct causing the Company or any of its Subsidiaries substantial public disgrace or disrepute or substantial economic harm, (iv) substantial and repeated failure to perform duties as reasonably directed by the Board, and such failure is not cured within twenty (20) days after you receive written notice thereof from the Board, (v) any act or omission aiding or abetting a competitor, supplier or customer of the Company or any of its Subsidiaries to the material disadvantage or detriment of the Company and its Subsidiaries, (vi) breach of fiduciary duty, gross negligence or willful misconduct with respect to the Company or any of its Subsidiaries, or (vii) any other material breach of this Agreement or of any other agreement between you and the Company or any of its Subsidiaries.

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended, and any successor statute.

"<u>Committee</u>" shall have the meaning set forth in the Plan.

"Company" shall mean Phoenix Services International, LLC, a Delaware limited liability company, and (except to the extent the context clearly requires otherwise) any subsidiary of Phoenix Services International.

"Confidential Information" means information, observations and data (including trade secrets) obtained by the Participant during the course of Participant's employment with the Company and its Subsidiaries (including those obtained by him while employed by the Company and its Subsidiaries prior to the date of this Agreement) concerning the business or affairs of the Company or any Subsidiary.

"Disability" shall have the meaning as set forth in Section 409A(a)(2)(c) of the Code.

"EBITDA" shall mean the consolidated earnings of the Company and its Subsidiaries before deductions for interest, taxes, depreciation and non-cash amortization.

"EBITDA Target Amount" means the target amount of EBITDA for each fiscal year ending December 31, 2012 through December 31, 2015 determined annually by the Board, after consultation with members of the Company's senior management team. The Board may adjust EBITDA targets for (i) general market conditions, (ii) new businesses entered or new businesses or assets acquired or (iii) assets sold or businesses exited.

"Fair Market Value" shall have the meaning set forth in the Plan.

"Family Group" means (i) in the case of any individual, such individual's spouse and descendants (by birth or adoption) and any trust solely for the benefit of such individual and/or such individual's spouse and/or such individual's descendants (by birth or adoption), parents or dependents, or any corporation or partnership in which the direct and beneficial owner of all of the equity interest is such individual and/or a member of such individual's Family Group; and (ii) in the case of a trust, the trust's beneficiaries as described in clause (i) above.

"Independent Third Party" means any Person who, immediately prior to the contemplated transaction, does not own directly or indirectly in excess of 5% of the Company's voting equity interests on a fully-diluted basis (a "5% Owner"), who does not control, is not controlled by or under common control with any such 5% Owner and who is not the spouse or descendent (by birth or adoption) of any such 5% Owner or a trust for the benefit of such 5% Owner and/or such other Persons.

"Limited Liability Company Agreement" shall mean that certain Third Amended and Restated Limited Liability Company Agreement, dated as of April 23, 2009, by the members of the Company, as the same may be amended from time to time in accordance with its terms.

"OGF" shall mean OGF AIS Holdings Corp., a Delaware corporation, and its affiliates and successors and assigns.

"Option Units" shall mean (i) all Units issued or issuable upon the exercise of the Option and (ii) all Units issued with respect to the Units referred to in clause (i) above by way of unit dividend or unit split or in connection with any conversion, merger, consolidation, recapitalization or other reorganization affecting the Units. Option Units shall continue to be Option Units in the hands of any holder other than you (except for the Company or OGF and, to the extent that you are permitted to

transfer Option Units pursuant to paragraph 14 hereof, purchasers pursuant to a Public Offering), and each such transferee thereof shall succeed to the rights and obligations of a holder of Option Units hereunder.

"Participant" shall mean the recipient of the Option hereunder.

"Person" shall mean an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Public Offering" means the sale, in an underwritten public offering registered under the 1933 Act, of the equity interests of the Company or any successor entity.

"Public Sale" shall mean any sale of Option Units to the public pursuant to an offering registered under the Securities Act or to the public through a broker, dealer or market maker pursuant to the provisions of Rule 144 adopted under the Securities Act.

"Sale of the Company" shall mean the sale of the Company to an Independent Third Party or group of Independent Third Parties (a) that constitutes a change in (i) the ownership or effective control of the Company or (ii) the ownership of a substantial portion of the Company's assets (as determined by analogy to the provisions of Section 1.409A-3(i)(5)(v), (vi), or (vii) of the Treasury Regulations) and (b) pursuant to which such party or parties acquire (i) all or substantially all of the Company's equity interests (whether by merger, consolidation or sale or transfer of the Company's equity interests) or (ii) all or substantially all of the Company's assets determined on a consolidated basis.

"Securities Act" shall mean the Securities Act of 1933, as amended and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

"Securities Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Exchange Act shall be deemed to include any corresponding provisions of future law.

"Subsidiary" shall mean any entity of which the Company owns securities having a majority of the ordinary voting power in electing the board of directors, board of managers or similar governing body directly or through one or more subsidiaries.

"Total Equity Value" shall mean the aggregate net sale proceeds which would be received by the Company's members if: (i) the assets of the Company as a going concern were sold at their Fair Market Value; (ii) the Company satisfied and paid in full all of its outstanding indebtedness for borrowed money; and (iii) such net sale proceeds were then distributed in accordance with the Limited Liability Company Agreement (or similar governing document) as then in effect, all as determined in good faith by the Board. When determined in connection with a Sale of the Company, Total Equity Value shall be derived from the consideration paid in connection with such Sale of the Company.

"Unit" shall have the meaning set forth in the Plan.

"Work Product" means discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports, patent applications, copyrightable work and mask work (whether or not including any confidential information) and all registrations or applications related thereto, all other proprietary information and all similar or related information (whether or not patentable) which relate to the Company's or any of its Subsidiaries' actual or anticipated business, research and development or existing or future products or services and which are conceived, developed or made by you (whether alone or jointly with others) while employed by the Company or its predecessor and its Subsidiaries, whether before or after the date of this Agreement.

2.      Option.

(a)     Terms.  Your Option is for the purchase of up to **15,000 Units** at a price per unit of  **$ 17.90** (the "Exercise Price"), payable upon exercise as set forth in paragraph 2(b) below.  The Exercise Price of your Option is equal to the Fair Market Value of the underlying Units on the date of this Agreement.  Your Option shall expire at the close of business on the tenth anniversary of the date hereof (the "Expiration Date"), subject to earlier expiration as provided in paragraphs 3(c) and 4 below. Your Option is <u>not</u> intended to be an "incentive stock option" within the meaning of Section 422 of the Code.

(b)     Payment of Option Price.  Subject to paragraph 4 below, your Option may be exercised in whole or in part upon payment of an amount (the "Option Price") equal to the product of (i) the Exercise Price multiplied by (ii) the number of Option Units to be acquired.  Payment shall be made in cash (including check, bank draft or money order).

3.      Vesting.

(a)     Normal Vesting.  Except as otherwise provided in paragraphs 3(b), 3(c) and 3(d) below, your Option shall vest in accordance with the following schedule, if (i) the Company's EBITDA meets the applicable EBITDA Target Amount as of such fiscal year end, and (ii) if as of each such date you are, and have been since the date hereof, employed by the Company or any of its Subsidiaries:

| Date | Annual Percentage of Option Vested |
| --- | --- |
| Company's fiscal year ending on or around December 31, 2012 | 25% |
| Company's fiscal year ending on or around December 31, 2013 | 25% |
| Company's fiscal year ending on or around December 31, 2014 | 25% |
| Company's fiscal year ending on or around December 31, 2015 | 25% |

(b)     To the extent the EBITDA Target Amount is not achieved in a certain fiscal year (a "Missed Fiscal Year"), if the Company's EBITDA in a subsequent fiscal year (through and including the last fiscal year) is at least equal to the EBITDA Target Amount for such fiscal year (an "Achieved Fiscal Year"), then for each Missed Fiscal Year, if the Company's aggregate EBITDA for such Missed Fiscal Year and all subsequent fiscal years (up to and including the Achieved Fiscal Year) is at least equal to the sum of the EBITDA Target Amounts for such fiscal years, then the percentage of your Option that will be vested for achieving the Achieved Fiscal Year shall include the percentage of your Option for such

Missed Fiscal Year.  If the percentage of your Option for any Missed Fiscal Year is vested in accordance with this paragraph 3(b), such fiscal year shall no longer be deemed to be a Missed Fiscal Year. Notwithstanding anything set forth herein to the contrary, in no event shall the aggregate amount of your Option to be vested exceed the amount of Units subject to the Option granted hereunder.

(c)     The portion of your Option which has become vested are referred to herein as "Vested Options" and all other portions of your Option are referred to herein as "Unvested Options." Any Unvested Options held by you at the time of a Sale of the Company (excluding the Unvested Options that shall become Vested Options in connection with such Sale of the Company in accordance with this paragraph 3(c)) shall expire and be forfeited, unless otherwise determined by the Committee or the Board in its sole discretion.  All Unvested Options held by you at the time of a Public Offering shall remain outstanding and be subject to the original vesting schedule set forth in paragraph 2(a) above.

(d)     Notwithstanding anything herein to the contrary, the Board may, in its sole discretion, accelerate the vesting of all or any portion of your Option at any time.

4.     Exercisability/Expiration of Option.

(a)     Your Option may be exercised in accordance with paragraph 5 only to the extent it has become vested pursuant to paragraph 3 above and has not expired and been forfeited pursuant to paragraph 4(b) below, and then only upon the earliest to occur of (a) the consummation of a Sale of the Company, (b) a Public Offering, (c) the date you become subject to any Disability, (d) the date of your death, (e) the date your employment with the Company terminates other than as the result of (i) the termination of your employment for Cause or (ii) your resignation, and (f) the Expiration Date.

(b)     Your Option shall expire and be forfeited to the extent that you do not exercise it on or before the earlier of (i) March 15 of the calendar year immediately following the calendar year in which the earliest of the events or dates set forth in paragraph 4(a) above occurs and (ii) the Expiration Date.  Any portion of your Option that is not vested as of the date your employment with the Company terminates for any reason shall expire and be forfeited on such date and the number of Option Units with respect to which your Option may be exercised shall not increase once you cease to be employed by the Company.  Your Option shall expire and be forfeited in its entirety (i) on the date your employment is terminated by reason of your resignation, (ii) on the date your employment is terminated for Cause at any time, or (iii) immediately following a Sale of the Company to the extent you do not exercise your Option on (or, if your Option previously became exercisable, prior to) the date of the Sale of the Company.

5.     Procedure for Exercise.  You may exercise all or any portion of your Option, to the extent it has vested pursuant to paragraph 3 above and is exercisable pursuant to paragraph 4 above, at any time and from time to time prior to its expiration, by delivering written notice to the Company (to the attention of the Company's Secretary) and your written acknowledgement that you have reviewed and have been afforded an opportunity to ask questions of management of the Company with respect to all financial and other information provided to you regarding the Company, together with payment of the Option Price in accordance with the provisions of paragraph 2(b) above. As a condition to any exercise of your Option, you shall (a) permit the Company to deliver to you all financial and other information regarding the Company it believes necessary to enable you to make an

informed investment decision, (b) make all customary investment representations which the Company requires and (c) execute and deliver a joinder to the Limited Liability Company Agreement and thereby become a "Member" and a holder of "Management Units" thereunder.

6.      Securities Laws Restrictions and Other Restrictions on Transfer of Option Units. You represent and warrant that when you exercise your Option you shall be purchasing Option Units for your own account and not on behalf of others.  You understand and acknowledge that federal and state securities laws govern and restrict your right to offer, sell or otherwise dispose of any Option Units unless your offer, sale or other disposition thereof is registered or qualified under the Securities Act and applicable state securities laws, or in the opinion of the Company's counsel, such offer, sale or other disposition is exempt from registration or qualification thereunder.  You agree that you shall not offer, sell or otherwise dispose of any Option Units in any manner which would: (i) require the Company to file any registration statement with the Securities and Exchange Commission (or any similar filing under state law) or to amend or supplement any such filing or (ii) violate or cause the Company to violate the Securities Act, the rules and regulations promulgated thereunder or any other state or federal law.  You further understand that the certificates for any Option Units you purchase shall bear such legends as the Company deems necessary or desirable in connection with the Securities Act or other rules, regulations or laws.

7.      Non-Transferability of Option.  Your Option is personal to you and is not transferable by you other than by will or the laws of descent and distribution.  During your lifetime only you (or your guardian or legal representative) may exercise your Option.  In the event of your death, your Option may be exercised only (i) by the executor or administrator of your estate or the person or persons to whom your rights under the Option shall pass by will or the laws of descent and distribution and (ii) to the extent that you were entitled to so exercise hereunder at the date of your death.

8.      Conformity with Plan.  Your Option is intended to conform in all respects with, and is subject to all applicable provisions of, the Plan (which is incorporated herein by reference). Inconsistencies between this Agreement and the Plan shall be resolved in accordance with the terms of the Plan.  By executing and returning the enclosed copy of this Agreement, you acknowledge your receipt of this Agreement and the Plan and agree to be legally bound by all of the terms of this Agreement and the Plan.

9.      Rights of Participants.  Nothing in this Agreement shall interfere with or limit in any way the right of the Company to terminate your employment at any time (with or without Cause), nor confer upon you any right to continue in the employ of the Company for any period of time or to continue your present (or any other) rate of compensation, and in the event of your termination of employment (including, but not limited to, termination by the Company without Cause), any portion of your Option that was not previously vested and exercisable shall automatically expire and be forfeited. Nothing in this Agreement shall confer upon you any right to be selected again as a Plan participant, and nothing in the Plan or this Agreement shall provide for any adjustment to the number of Option Units subject to your Option upon the occurrence of subsequent events except as provided in paragraph 11 below.  Prior to your exercise of your Option and the delivery to you of the Units represented thereby, you shall not have any rights as a holder of Units with respect to any Units covered by such Option (including any liquidation, redemption, dividend or voting rights).

10.    Withholding of Taxes. The Company shall be entitled, if necessary or desirable, to withhold from you from any amounts due and payable by the Company to you (or secure payment from you in lieu of withholding) the amount of any minimum statutory withholding with respect to any Option Units issued or issuable under this Plan, and the Company may defer such issuance unless indemnified by you to its satisfaction.

11.    Adjustments. In the event of a reorganization, recapitalization, unit dividend or unit split, or combination or other change in the Units or any merger, consolidation or exchange of Units, the Board or the Committee may make such adjustments in the number and type of units authorized by the Plan, the number and type of units covered by your Option (including the issuer thereof in the case of a merger, consolidation or exchange in which the surviving entity or a parent thereof assumes or replaces all or a portion of the outstanding Options) and the Exercise Price specified herein as may be determined to be appropriate and equitable, in order to prevent the dilution or enlargement of rights under your Option. The issuance by the Company of units of any class, or options or securities exercisable or convertible into units of any class, for cash or property, or for labor or services either upon direct sale, or upon the exercise of rights or warrants to subscribe therefor, or upon exercise or conversion of other securities, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number or price of Units then subject to any Options.

12.    Right to Purchase Option Units Upon Your Termination of Employment.

(a)    Repurchase of Option Units. If (i) your employment with the Company shall terminate (the "Termination") for any reason (or no reason), including upon your death, Disability, resignation or termination with or without Cause (the date on which such termination occurs being referred to as the "Termination Date"), or (ii) you violate any agreement between you and the Company with respect to non-solicitation, confidentiality, protection of trade secrets or the like, whether prior or subsequent to Termination of your employment with the Company, then, in any such case, the Company (or its designees) shall have the option to repurchase all or any part of the Option Units issued or issuable upon exercise of your Option, whether held by you or by one or more of your transferees, at the price determined in accordance with the provisions of paragraph 13 hereof (the "Repurchase Option").

(b)    Repurchase by Company. The Company (or its designee) may elect to purchase all or any portion of the Option Units by delivery of written notice (the "Repurchase Notice") to you or any other holders of your Option Units (i) with respect to a repurchase right arising out of clause (i) of paragraph 12(a) above, within  six months after the Termination Date for any Option Units issued at least six months and one day prior to such Termination Date (or in the case of Option Units issued six months or less prior to such Termination Date or at any time after such Termination Date, no earlier than six months and one day and no later than nine months and one day after the date of the issuance of such Option Units), or (ii) with respect to a repurchase right arising out of clause (ii) of paragraph 12(a) above, within six months after the date such non-solicitation, confidentiality, protection of trade secret or similar provision expires (the period referred to in the foregoing clause (i) and (ii), as applicable,  the "Repurchase Notice Period"). The Repurchase Notice shall set forth the number of Option Units to be acquired from you and such other holder(s), the aggregate consideration to be paid for such Option Units and the time and place for the closing of the transaction. The number of Option Units to be repurchased by the Company shall first be satisfied to the extent possible from the Option Units held by you at the time of delivery of the Repurchase Notice. If the number of Option Units then held by you is less than the total number of Option Units the Company has elected to purchase, then

the Company shall purchase the remaining Option Units elected to be purchased from the other holders thereof, pro rata according to the number of Option Units held by each such holder at the time of delivery of such Repurchase Notice (determined as close as practical to the nearest whole Unit).  The Company may assign its rights set forth in this paragraph 12 to any Person.

(c)     Repurchase by Investors.  If for any reason the Company does not elect to purchase all of the Option Units pursuant to the Repurchase Option, then OGF (or any designees thereof) shall be entitled to exercise the Company's Repurchase Option in the manner set forth in paragraph 12(a) for all or any portion of the number of Option Units the Company has not elected to purchase (the "Available Units").  As soon as practicable after the Company has determined that there shall be Available Units, but in any event within 45 days prior to the expiration of the Repurchase Notice Period referred to in paragraph 12(b) above, the Company shall deliver written notice (the "Option Notice") to OGF setting forth the number of Available Units and the price for each Available Unit.  Notwithstanding any provision to the contrary, OGF shall not be permitted to exercise the Company's Repurchase Option until and to the extent that such Repurchase Option becomes exercisable by the Company pursuant to paragraph 12(b) above.  OGF may elect to purchase any number of Available Units by delivering written notice to the Company within 30 days after receipt of the Option Notice from the Company.  As soon as practicable, and in any event within five days after the expiration of such 30-day period, the Company shall notify you and any other holder(s) of Option Units as to the number of Option Units being purchased from you by OGF (the "Supplemental Repurchase Notice").  At the time the Company delivers the Supplemental Repurchase Notice to you, the Company shall also deliver written notice to OGF setting forth the number of Units OGF is entitled to purchase, the aggregate purchase price and the time and place of the closing of the transaction.  OGF may assign its rights set forth in this paragraph 12 to any Persons.

(d)     Closing of Repurchase of Option Units.  The closing of the purchase of Option Units pursuant to this paragraph 12 shall take place on the date designated by the Company in the Repurchase Notice or Supplemental Repurchase Notice, as the case may be, which date shall not be more than 60 days nor less than five days after the delivery of the later of either such notice to be delivered.  At the closing, the purchaser or purchasers shall pay the purchase price in the manner specified in paragraph 13(b) and you and any other holders of Option Units being purchased shall deliver the certificate or certificates representing such Option Units to the purchaser or purchasers or their nominees, accompanied by duly executed unit powers.  Any purchaser of Option Units under this paragraph 12 shall be entitled to (i) receive customary representations and warranties from you and any other selling holders of Option Units regarding the sale of such Option Units (including representations and warranties regarding good title to such Option Units, free and clear of any liens or encumbrances) and (ii) require that signatures be guaranteed by a national bank or reputable securities broker.

(e)     Deemed Repurchase.  Upon delivery of the Repurchase Notice or Supplemental Repurchase Notice, as applicable, then from and after such time, the holder of such Option Units from whom such securities are to be purchased shall cease to have any rights as a holder of such securities (other than the right to receive payment of such consideration in accordance with paragraph 13 below), and such securities shall be deemed purchased in accordance with the applicable provisions hereof and the purchaser thereof shall be deemed the owner (of record and beneficially) and holder(s) of such securities, whether or not the certificate representing such Option Units has been delivered as required by this Agreement.

(f)     _Revocation of Election_.  Any election by the Company or OGF (or any of their designees) to purchase Option Units pursuant to this paragraph 12 shall be revocable by such Person (with respect to all or any portion of the Option Units elected to be purchased) at any time prior to the closing of such purchase, without any liability whatsoever to such Person in respect of the rights and obligations in this paragraph 12.

13.     _Purchase Price for Option Units_.

(a)     _Purchase Price_.  In the event that (i) your Termination is effected by a termination of your employment for Cause or (ii) prior to the consummation of any repurchase, you violate any agreement between you and the Company with respect to non-solicitation, confidentiality, protection of trade secrets or the like, the purchase price for each Option Unit shall be the lesser of (1) the exercise price paid by you for such Option Unit and (2) the Fair Market Value thereof as of the Termination Date.  Other than as described in the preceding sentence, the purchase price for each Option Unit shall be the Fair Market Value thereof as of the Termination Date; _provided_, _however_, _that_ if you receive a repurchase price per Option Unit equal to the Fair Market Value thereof pursuant to this sentence but subsequently violate any agreement between you and the Company with respect to non-solicitation, confidentiality, protection of trade secrets or the like, then you shall immediately remit a cash payment to the Company equal in amount to the positive difference, if applicable, between the Fair Market Value received by you per each such Option Unit and the corresponding exercise price paid by you for each such Option Unit.

(b)     _Manner of Payment_.  If the Company elects to purchase all or any part of the Option Units, including Option Units held by one or more transferees, the Company shall pay for such Option Units by certified check or wire transfer of funds to the extent such payment would not cause the Company to violate the General Corporation Law of the State of Delaware and would not cause the Company to breach any agreement to which it is a party relating to the indebtedness for borrowed money or other material agreement (including any restricted payment covenant prohibiting direct or indirect distributions to the Company in order to effectuate such repurchase) (each such restriction, a "Restrictive Covenant").  If any such Restrictive Covenants prohibit the repurchase of Option Units hereunder which the Company is otherwise entitled to make, the time periods provided in this paragraph 13 shall be suspended, and the Company may make such repurchases as soon as it is permitted to do so under such restrictions.  In addition, if any such Restrictive Covenant prohibits the repurchase of Option Units hereunder with a cashier's or certified check or wire transfer of funds, then the Company may make such repurchase of Option Units with a three-year junior subordinated note payable on maturity bearing interest (payable at maturity) at a simple rate per annum equal to the Base Rate (a "Junior Subordinated Note").  Any Junior Subordinated Note issued by the Company pursuant to this paragraph 13(b) shall be subject to any Restrictive Covenants and any subordination provisions required by the Company's senior and subordinated lenders and may be prepaid without premium or penalty at the election of the Company to the extent permitted by the Company's loan agreements and related documents with the Company's senior and subordinated lenders.  In addition, the Company may pay the purchase price for such Option Units by offsetting amounts outstanding under any indebtedness or obligations owed by you to the Company.  If OGF (or its designees) elects to purchase all or any portion of the Available Units, OGF (or its designees) shall pay for that portion of such Option Units by certified check or wire transfer of funds.

PHOENIX SERVICES INTERNATIONAL LLC

14.    Restrictions on Transfer.

(a)    Transfer of Option Units.  You shall not sell, pledge or otherwise transfer any interest in any Option Units except pursuant to a Public Sale or the provisions of paragraph 12 hereof or as otherwise permitted pursuant to the terms of the Limited Liability Company Agreement ("Exempt Transfers") and except pursuant to the provisions of this paragraph 14.  Prior to transferring any interest in any Option Units (other than a Public Sale) to any Person, you shall cause the prospective transferee to be bound by this Agreement and to execute and deliver to the Company and OGF a counterpart of this Agreement.

(b)    Termination of Restrictions.  The restrictions on the transfer of Option Units set forth in this paragraph 14 shall terminate when the Company has sold Units pursuant to a Public Offering.

15.  Confidential Information.    You acknowledge that the Confidential Information is the property of the Company or such Subsidiary.  Therefore, you agree that you shall not disclose to any person or entity or use for any purpose (other than for the benefit of the Company and its Subsidiaries) any Confidential Information or any confidential or proprietary information of other persons or entities in the possession of the Company and its Subsidiaries ("Third Party Information"), without the prior written consent of the Board, unless and to the extent that the Confidential Information or Third Party Information becomes generally known to and available for use by the public other than as a result of your acts or omissions.  You shall deliver to the Company at the termination or expiration of the Employment Period (as defined below), or at any other time the Company may request, all memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documents and data (and copies thereof) embodying or relating to the Confidential Information, Work Product or the business of the Company or any Subsidiary which you may then possess or have under your control.

16.    Non-Compete; Non-Solicitation.

(a)    You hereby acknowledges that, during the course of your employment with the Company you have and shall become familiar with the Company's and its Subsidiaries' trade secrets and other Confidential Information. You acknowledge and agree that the Company and its Subsidiaries would be irreparably damaged if you were to provide services to or otherwise participate in the business of any person or entity competing with the Company or its Subsidiaries or providing services similar to those of the Company and its Subsidiaries and that any such competition or provision of services by you would result in a significant loss of goodwill by the Company and its Subsidiaries.  You further acknowledge and agree that the covenants and agreements set forth in this paragraph 16 were a material inducement to the Company to enter into this Agreement and to perform its obligations hereunder, and that the Company would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the parties hereto if you breached the provisions of this paragraph 16. Therefore, you agree that, during the term of your employment with the Company and its Subsidiaries (the "Employment Period") and for 12 months thereafter (the "Noncompete Period"), you shall not directly or indirectly own any interest in, manage, control, participate in (whether as an officer, director, employee, partner, agent, representative or otherwise), consult with, render services for, or in any other manner engage in any business competing with the businesses of the Company or its Subsidiaries, as such businesses exist or are or were in the process of being developed during the Employment Period within any geographical area in which the Company or its Subsidiaries engage or plan to engage in such businesses.  Nothing herein shall prohibit you from being a passive owner of not

more than 2% of the outstanding stock of any class of a corporation which is publicly traded so long as you do not have any active participation in the business of such corporation.

(b)     During the Noncompete Period, you shall not directly or indirectly through another person or entity (i) induce or attempt to induce any employee of the Company or any Subsidiary to leave the employ of the Company or such Subsidiary, or in any way interfere with the relationship between the Company or any Subsidiary and any employee thereof, (ii) hire any person who was an employee of the Company or any Subsidiary at any time during the six month period prior to the date of hire, (iii) call on, solicit, or service any customer, supplier, licensee, licensor or other business relation or prospective client of the Company or any of its Subsidiaries with respect to products and/or services that are or have been provided by the Company or such Subsidiary during the twelve-month period prior to the termination of the Employment Period, or which the Company or any of its Subsidiaries is currently in the process of developing or (iv) induce or attempt to induce any customer, supplier, licensee, licensor, franchisee or other business relation of the Company or any Subsidiary to cease doing (or reduce its) business with the Company or such Subsidiary, or in any way interfere with the relationship between any such customer, supplier, licensee or business relation and the Company or any Subsidiary (including, without limitation, making any negative or disparaging statements or communications regarding the Company or its Subsidiaries).

(c)     In addition to the other remedies available hereunder, in the event of a breach or violation by you of this paragraph 16, the Noncompete Period shall be automatically extended by the amount of time between the initial occurrence of the breach or violation and when such breach or violation has been duly cured. You acknowledge that the restrictions contained in this paragraph 16 are reasonable and that you have reviewed the provisions of this Agreement with your legal counsel.  You acknowledge and agree that the covenants contained in this paragraph 16 are in addition to, rather than in lieu of, any similar or related covenants to which you are a party or by which you are bound.

(d)     You agree that you shall not, at any time, whether during or after you cease to provide services to the Company or any of its Subsidiaries, make or publish any untruthful statement (orally or in writing) that intentionally libels, slanders, disparages or otherwise defaces the goodwill or reputation (whether or not such disparagement legally constitutes libel or slander) of the Company, any Subsidiary or any of their affiliates, or its other officers, managers, directors, partners or investment professionals.  You acknowledge that you, as part of his employment, are responsible for preserving the goodwill or reputation of the aforementioned parties.

17.     Additional Restrictions on Transfer.

(a)     Restrictive Legend.  The certificates representing the Option Units shall bear the following legend:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON April 23, 2009, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION FROM REGISTRATION THEREUNDER.  THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER, CERTAIN REPURCHASE OPTIONS AND CERTAIN OTHER AGREEMENTS SET FORTH IN AN OPTION AGREEMENT

BETWEEN THE COMPANY AND Stan Ben, DATED AS OF December 20, 2011, A COPY OF WHICH MAY BE OBTAINED BY THE HOLDER HEREOF AT THE COMPANY'S PRINCIPAL PLACE OF BUSINESS WITHOUT CHARGE."

(b)     Opinion of Counsel.  You may not sell, transfer or dispose of any Option Units (except pursuant to an effective registration statement under the Securities Act) without first delivering to the Company an opinion of counsel reasonably acceptable in form and substance to the Company that registration under the Securities Act or any applicable state securities law is not required in connection with such transfer.

(c)     Holdback.  You agree not to effect any public sale or distribution of any equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, during the seven days prior to and the 180 days after the effectiveness of any Public Offering, except as part of such Public Offering if otherwise permitted by the Company.

18.     Management Units.  You acknowledge and agree that your Option Units shall be deemed to be Management Units for all purposes of the Limited Liability Company Agreement (including Article 15) and, as such, shall be subject to the provisions thereof.

19.     Remedies.    The parties hereto (and OGF as a third-party beneficiary) acknowledge and agree that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that the parties hereto (and OGF as a third-party beneficiary) shall be entitled to specific performance and/or injunctive relief (without posting bond or other security) from any court of law or equity of competent jurisdiction in order to enforce or prevent any violation of the provisions of this Agreement.

20.     Amendment.    Except as otherwise provided herein and notwithstanding anything to the contrary in the Plan, any provision of this Agreement may be amended or waived only with the prior written consent of the Company and the Plan participants who have been granted options to purchase a majority of the options under the Plan (based on the number of underlying Option Units issuable upon the exercise of all such options) theretofore granted under the Plan (unless you will be treated in a manner materially different from other Plan participants, in which case your individual written consent will also be required); provided that no provision of paragraphs 12 through this paragraph 20 may be amended or waived without the prior written consent of OGF. Notwithstanding any other provisions of the Plan, and in addition to the powers of amendment and modification set forth herein, the provisions hereof and the provisions of any Option granted hereunder may be amended unilaterally by the Committee from time to time (but shall have no obligation to do so) to the extent necessary (and only to the extent necessary) to prevent the implementation, application or existence (as the case may be) of any such provision from causing any Option granted hereunder to be treated as providing for the deferral of compensation pursuant to Code §409A subject to federal income tax by reason of Code §409A(a)(1)(A).

21.     Successors and Assigns.  Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns.

22.     Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this

Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

23.   _Counterparts_.  This Agreement may be executed in one or more counterparts (including by means of telecopied signature pages), each of which shall be an original and all of which taken together shall constitute one and the same agreement.

24.   _Descriptive Headings_.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

25.   _Governing Law_.  All issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

26.   _Notices_.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when personally delivered, sent by telecopy (with receipt confirmed) on a business day during regular business hours of the recipient (or, if not, on the next succeeding business day) or one business day after sent by reputable overnight express courier (charges prepaid).  Such notices, demands and other communications shall be sent to you and to the Company and OGF at the addresses listed below:

If to the Participant:

Stan Ben
1164 Anchor Point
Del Ray Beach, FL 33444

If to the Company:

Phoenix Services International LLC
148 West State Street, Suite # 301
Kennett Square, PA 19348
Attn: John J. Hilbert, Jr., CFO
Telecopy:  610-347-0443

<u>With a copy to (which shall not constitute notice to the Company)</u>:

OGF AIS Holdings Corp.
c/o Olympus Growth Fund V, L.P.
Metro center, One Station Place
Stamford, CT 06902
Telephone:  (203) 353-5900
Facsimile:  (203) 353-5910
Attn:    L. David Cardenas
        Mike Horgan


Kirkland & Ellis LLP
300 N. LaSalle St.
Chicago, Illinois 60654
Attn:    John A. Schoenfeld, P.C.
        Roger D. Rhoten
Telephone:    (312) 862-2000
Telecopy:      (312) 862-2200


<u>If to OGF</u>:

OGF AIS Holdings Corp.
c/o Olympus Growth Fund V, L.P.
Metro center, One Station Place
Stamford, CT 06902
Telephone:  (203) 353-5900
Facsimile:  (203) 353-5910
Attn:    L. David Cardenas
        Mike Horgan

<u>With a copy to (which shall not constitute notice to OGF)</u>:

Kirkland & Ellis LLP
300 N. LaSalle St.
Chicago, Illinois 60654
Attn:    John A. Schoenfeld, P.C.
        Roger D. Rhoten
Telephone:    (312) 862-2000
Telecopy:      (312) 862-2200

or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

      27.    <u>Third-Party Beneficiary</u>.  The Company and you acknowledge that OGF is a third-party beneficiary under this Agreement.

28.   <u>Entire Agreement</u>.   Except as otherwise expressly set forth herein, this Agreement and the Plan embody the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.  If there are any conflicts in terms and conditions between this Agreement and the Plan, the terms and conditions of the Plan shall govern, unless otherwise determined by the Committee or the Board.

29.   <u>Rule 701 Compensation</u>.  The Company and you acknowledge and agree that this Agreement has been executed and delivered, and the Option has been granted hereunder, in connection with and as a part of the compensation and incentive arrangements between the Company and you and not as part of a capital raising effort of the Company.  The grant of the Option hereunder and any issuance of Option Units upon the exercise of the Option are intended to qualify as an exempt offering under Rule 701 of the Securities Act.

30.   <u>Code Section 280G</u>.  Notwithstanding any provision of this Agreement to the contrary, if all or any portion of the payments or benefits received or realized by you pursuant to this Agreement either alone or together with other payments or benefits which you receive or realize or are then entitled to receive or realize from the Company or any of its affiliates would constitute a "parachute payment" within the meaning of Section 280G of the Code and the regulations promulgated thereunder or any corresponding and applicable state law provision, such payments or benefits provided to you shall be reduced by reducing the amount of payments or benefits payable to you pursuant to paragraphs 3 and 4 of this Agreement to the extent necessary so that no portion of such payments or benefits shall be subject to the excise tax imposed by Section 4999 of the Code and any corresponding and/or applicable state law provision; <u>provided that</u> such reduction shall only be made if, by reason of such reduction, your net after tax benefit shall exceed the net after tax benefit if such reduction were not made.  For purposes of this paragraph, "<u>net after tax benefit</u>" shall mean the sum of (i) the total amount received or realized by you pursuant to this Agreement that would (in the absence of any reduction contemplated by this paragraph 30) constitute a "parachute payment" within the meaning of Section 280G of the Code and any corresponding and applicable state law provision, plus (ii) any other payments or benefits which you receive or realize or are then entitled to receive or realize from the Company and any of its affiliates that would (in the absence of any reduction contemplated by this paragraph 30) constitute a "parachute payment" within the meaning of Section 280G of the Code and any corresponding and applicable state law provision, less (iii) the amount of federal or state income taxes payable with respect to the payments or benefits described in (i) and (ii) above calculated at the maximum marginal individual income tax rate for each year in which payments or benefits shall be realized by you (based upon the rate in effect for such year as set forth in the Code, and any corresponding applicable state law provisions at the time of the first receipt or realization of the foregoing), less (iv) the amount of excise taxes imposed with respect to the payments or benefits described in (i) and (ii) above by Section 4999 of the Code and any corresponding and applicable state law provision.

31.   <u>Code Section 409A</u>.

(a)   The Options issued hereunder are intended to qualify as an arrangement that does not constitute "deferred compensation" for purposes of Code §409A(a) by reason of the exception for "short-term deferrals" set forth in Section 1.409A-1(b)(4) of the Treasury Regulations (except that any "transaction-based" payments to which you become entitled pursuant to paragraph 32(b) below

PHOENIX SERVICES INTERNATIONAL LLC

are intended to constitute deferred compensation that is not subject to federal income tax pursuant to Code §409A(a)(1)(A)), and the terms of this Agreement shall be interpreted in a manner consistent with such intention.  However, neither the Company nor any of its affiliates makes any representations with respect to the application of Code §409A to the Options and, by the acceptance of the Options, the Participant agrees to accept the potential application of Code §409A to the Options and the other tax consequences of the issuance, vesting, ownership, modification, adjustment, and disposition of the Options.  The Participant agrees to hold harmless and indemnify the Company and its affiliates from any adverse tax consequences to the Participant with respect to the Options, any withholding or other tax obligations of the Company or its affiliates with respect to the Options, and from any action or inaction or omission of the Company or its affiliates pursuant to the Plan or otherwise that may cause such Options to be or become subject to federal income tax pursuant to Code §409A(a)(1)(A).

(b)  To the extent that you exercise your Options in connection with the Sale of the Company and, a consequence thereof, would (in the absence of this paragraph 32(b)) become entitled to one or more payments after the date such Sale of the Company that are treated as compensation for federal income tax purposes ("transaction-based compensation"), then you shall be entitled to receive such transaction based compensation only to the extent (a) it is paid on the same schedule and under the same terms and conditions (i) as apply to payments to holders of Company Units generally with respect to such Units pursuant to a Sale of the Company structured as a sale of Units that meets the requirements of Section 1.409A-3(i)(5)(v) of the Treasury Regulations or (ii) as apply to payments to the Company pursuant to a sale of the Company's assets that meets the requirements of Section 1.409A-3(i)(5)(vii) of the Treasury Regulations, and (b) the transaction-based compensation is paid not later than five years after the date the Sale of the Company is consummated.  Each such payment shall be deemed to be a separate payment for purposes of Code §409A.

(c)  For purposes of this Agreement, "termination of employment," "cease to be employed" or similar phrases shall have the meaning for "termination of employment" set forth in the first sentence of Section 1.409A-1(h)(i)(ii) of the Treasury Regulations.

32.  <u>No Strict Construction</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

33.  <u>Further Assurances</u>.  At any time or from time to time after the date hereof, the parties agree to cooperate with each other, and at the request of any other party, to execute and deliver any further instruments or documents and to take all such further action as the other party may reasonably request in order to evidence or effectuate the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the parties hereunder.

34.  <u>Business Days</u>.  If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the state in which the Company's chief executive office is located, the time period shall automatically be extended to the business day immediately following such Saturday, Sunday or legal holiday.

35.  <u>Delivery by Facsimile</u>.  This Agreement and any signed agreement or instrument entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto,

to the extent signed and delivered by means of a facsimile machine, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine as a defense to the formation of a contract and each such party forever waives any such defense.

*  *  *  *  *

Please execute the extra copy of this Option Agreement in the space below and return it to John Hilbert, the Company's CFO at its executive offices to confirm your understanding and acceptance of the agreements contained in this Option Agreement.

Very truly yours,

PHOENIX SERVICES INTERNATIONAL, LLC

By: _____

Name:  R. Douglas Lane
Title:    President

Enclosures:     (1)     Extra copy of this Option Agreement
                (2)     Copy of the Plan

The undersigned hereby acknowledges having read this Option Agreement and the Plan and hereby agrees to be bound by all provisions set forth herein and in the Plan.

Dated as of December 20, 2011                  PARTICIPANT

                                               _____

                                               Name: Stan Ben

### CONSENT

The undersigned spouse of Stan Ben hereby acknowledges that I have read the foregoing Option Agreement and that I understand its contents.  I am aware that the Option Agreement provides for the repurchase of my spouse's Option Units under certain circumstances and imposes other restrictions on the transfer of such Option Units.  I agree that my spouse's interest in the Option Units is subject to this Option Agreement and any interest I may have in such Option Units shall be irrevocably bound by this Option Agreement and further that my community property interest, if any, shall be similarly bound by this Option Agreement.  I am aware that the legal, financial and other matters contained in this Option Agreement are complex and I am free to seek advice with respect thereto from independent counsel.  I have either sought such advice or determined after carefully reviewing this Option Agreement that I will waive such right.

_____

Spouse

_____

Witness

# EXHIBIT C



**PHOENIX SERVICES INTERNATIONAL LLC**
148 West State Street
Suite # 301
Kennett Square, PA 19348

May 6, 2014

Re:   Phoenix Services International LLC
      <u>Grant of Nonqualified Option</u>



Dear Participant:

The Company is pleased to advise you that its Board of Managers has granted to you an option (an "<u>Option</u>"), as provided below, under the Phoenix Services International 2009 Equity Incentive Plan (the "<u>Plan</u>"), a copy of which is attached hereto and incorporated herein by reference.

1.   <u>Definitions</u>.  For the purposes of this Option Agreement (this "<u>Agreement</u>"), the following terms shall have the meanings set forth below:

"<u>Base Rate</u>" shall mean, on any date, a variable rate per annum equal to the rate of interest most recently published by <u>The Wall Street Journal</u> as the "prime rate" at large U.S. money center banks.

"<u>Board</u>" shall mean the Board of Managers of the Company.

"<u>Cause</u>" means, with respect to you, one or more of the following: (i) the commission of a felony or other crime involving moral turpitude, (ii) the commission of any act or the omission to take any act, either of which results in disloyalty or fraud toward the Company or any of its Subsidiaries, or involving dishonesty in connection with the Company or any of its Subsidiaries which is materially detrimental to the Company or any of its Subsidiaries, (iii) reporting to the workplace under the influence of alcohol or illegal drugs, the use of illegal drugs (whether or not at the workplace) or other repeated conduct causing the Company or any of its Subsidiaries substantial public disgrace or disrepute or substantial economic harm, (iv) substantial and repeated failure to perform duties as reasonably directed by the Board, and such failure is not cured within twenty (20) days after you receive written notice thereof from the Board, (v) any act or omission aiding or abetting a competitor, supplier or customer of the Company or any of its Subsidiaries to the material disadvantage or detriment of the Company and its Subsidiaries, (vi) breach of fiduciary duty, gross negligence or willful misconduct with respect to the Company or any of its Subsidiaries, or (vii) any other material breach of this Agreement or of any other agreement between you and the Company or any of its Subsidiaries.

"<u>Code</u>" shall mean the Internal Revenue Code of 1986, as amended, and any successor statute.

"<u>Committee</u>" shall have the meaning set forth in the Plan.

"<u>Company</u>" shall mean Phoenix Services International, LLC, a Delaware limited liability company, and (except to the extent the context clearly requires otherwise) any subsidiary of Phoenix Services International.

"Confidential Information" means information, observations and data (including trade secrets) obtained by the Participant during the course of Participant's employment with the Company and its Subsidiaries (including those obtained by him while employed by the Company and its Subsidiaries prior to the date of this Agreement) concerning the business or affairs of the Company or any Subsidiary.

"Disability" shall have the meaning as set forth in Section 409A(a)(2)(c) of the Code.

"EBITDA" shall mean the consolidated earnings of the Company and its Subsidiaries before deductions for interest, taxes, depreciation and non-cash amortization.

"EBITDA Target Amount" means the target amount of EBITDA for each fiscal year ending December 31, 2014 through December 31, 2016 determined annually by the Board, after consultation with members of the Company's senior management team.  The Board may adjust EBITDA targets for (i) general market conditions, (ii) new businesses entered or new businesses or assets acquired or (iii) assets sold or businesses exited.

"Fair Market Value" shall have the meaning set forth in the Plan.

"Family Group" means (i) in the case of any individual, such individual's spouse and descendants (by birth or adoption) and any trust solely for the benefit of such individual and/or such individual's spouse and/or such individual's descendants (by birth or adoption), parents or dependents, or any corporation or partnership in which the direct and beneficial owner of all of the equity interest is such individual and/or a member of such individual's Family Group; and (ii) in the case of a trust, the trust's beneficiaries as described in clause (i) above.

"Independent Third Party" means any Person who, immediately prior to the contemplated transaction, does not own directly or indirectly in excess of 5% of the Company's voting equity interests on a fully-diluted basis (a "5% Owner"), who does not control, is not controlled by or under common control with any such 5% Owner and who is not the spouse or descendent (by birth or adoption) of any such 5% Owner or a trust for the benefit of such 5% Owner and/or such other Persons.

"Limited Liability Company Agreement" shall mean that certain Third Amended and Restated Limited Liability Company Agreement, dated as of April 23, 2009, by the members of the Company, as the same may be amended from time to time in accordance with its terms.

"OGF" shall mean OGF AIS Holdings Corp., a Delaware corporation, and its affiliates and successors and assigns.

"Option Units" shall mean (i) all Units issued or issuable upon the exercise of the Option and (ii) all Units issued with respect to the Units referred to in clause (i) above by way of unit dividend or unit split or in connection with any conversion, merger, consolidation, recapitalization or other reorganization affecting the Units.  Option Units shall continue to be Option Units in the hands of any holder other than you (except for the Company or OGF and, to the extent that you are permitted to transfer Option Units pursuant to paragraph 14 hereof, purchasers pursuant to a Public Offering), and each such transferee thereof shall succeed to the rights and obligations of a holder of Option Units hereunder.

"Participant" shall mean the recipient of the Option hereunder as set forth on the Participant signature page attached hereto.

"Person" shall mean an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"Public Offering" means the sale, in an underwritten public offering registered under the 1933 Act, of the equity interests of the Company or any successor entity.

"Public Sale" shall mean any sale of Option Units to the public pursuant to an offering registered under the Securities Act or to the public through a broker, dealer or market maker pursuant to the provisions of Rule 144 adopted under the Securities Act.

"Sale of the Company" shall mean the sale of the Company to an Independent Third Party or group of Independent Third Parties (a) that constitutes a change in (i) the ownership or effective control of the Company or (ii) the ownership of a substantial portion of the Company's assets (as determined by analogy to the provisions of Section 1.409A-3(i)(5)(v), (vi), or (vii) of the Treasury Regulations) and (b) pursuant to which such party or parties acquire (i) all or substantially all of the Company's equity interests (whether by merger, consolidation or sale or transfer of the Company's equity interests) or (ii) all or substantially all of the Company's assets determined on a consolidated basis.

"Securities Act" shall mean the Securities Act of 1933, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Act shall be deemed to include any corresponding provisions of future law.

"Securities Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and applicable rules and regulations thereunder, and any successor to such statute, rules or regulations. Any reference herein to a specific section, rule or regulation of the Securities Exchange Act shall be deemed to include any corresponding provisions of future law.

"Subsidiary" shall mean any entity of which the Company owns securities having a majority of the ordinary voting power in electing the board of directors, board of managers or similar governing body directly or through one or more subsidiaries.

"Total Equity Value" shall mean the aggregate net sale proceeds which would be received by the Company's members if: (i) the assets of the Company as a going concern were sold at their Fair Market Value; (ii) the Company satisfied and paid in full all of its and its Subsidiaries outstanding indebtedness for borrowed money; and (iii) such net sale proceeds were then distributed in accordance with the Limited Liability Company Agreement (or similar governing document) as then in effect, all as determined in good faith by the Board. When determined in connection with a Sale of the Company, Total Equity Value shall be derived from the consideration paid in connection with such Sale of the Company.

"Unit" shall have the meaning set forth in the Plan.

"Work Product" means discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports, patent applications, copyrightable work and mask work (whether or not including any confidential information) and all registrations or applications related thereto, all other proprietary information and all similar or related information (whether or not patentable) which relate to the Company's or any of its Subsidiaries' actual or anticipated business, research and development or existing or future products or services and which are

-3-

conceived, developed or made by you (whether alone or jointly with others) while employed by the Company or its predecessor and its Subsidiaries, whether before or after the date of this Agreement.

    2.    <u>Option</u>.

    (a)    <u>Terms</u>.  Your Option is for the purchase of up to the number of Units reflected on the Participant signature page attached hereto at a price per unit as reflected on the Participant signature page attached hereto (the "<u>Exercise Price</u>"), payable upon exercise as set forth in paragraph 2(b) below.  The Exercise Price of your Option is equal to the Fair Market Value of the underlying Units on the date of this Agreement.  Your Option shall expire at the close of business on the tenth anniversary of the date hereof (the "<u>Expiration Date</u>"), subject to earlier expiration as provided in paragraphs 3(c) and 4 below. Your Option is <u>not</u> intended to be an "incentive stock option" within the meaning of Section 422 of the Code.

    (b)    <u>Payment of Option Price</u>.  Subject to paragraph 4 below, your Option may be exercised in whole or in part upon payment of an amount (the "<u>Option Price</u>") equal to the product of (i) the Exercise Price multiplied by (ii) the number of Option Units to be acquired.  Payment shall be made in cash (including check, bank draft or money order).

    3.    <u>Vesting</u>.

    (a)    <u>Normal Vesting</u>.  Except as otherwise provided in paragraphs 3(b), 3(c) and 3(d) below, your Option shall vest in accordance with the following schedule, if (i) the Company's EBITDA meets the applicable EBITDA Target Amount as of such fiscal year end, and (ii) if as of each such date you are, and have been since the date hereof, employed by the Company or any of its Subsidiaries:

| Date | Annual Percentage of Option Vested |
|------|------------------------------------|
| Company's fiscal year ending on or around December 31, 2014 | 25% |
| Company's fiscal year ending on or around December 31, 2015 | 25% |
| Company's fiscal year ending on or around December 31, 2016 | 25% |
| Company's fiscal year ending on or around December 31, 2017 | 25% |

    (b)    To the extent the EBITDA Target Amount is not achieved in a certain fiscal year (a "<u>Missed Fiscal Year</u>"), if the Company's EBITDA in a subsequent fiscal year (through and including the last fiscal year) is at least equal to the EBITDA Target Amount for such fiscal year (an "<u>Achieved Fiscal Year</u>"), then for each Missed Fiscal Year, if the Company's aggregate EBITDA for such Missed Fiscal Year and all subsequent fiscal years (up to and including the Achieved Fiscal Year) is at least equal to the sum of the EBITDA Target Amounts for such fiscal years, then the percentage of your Option that will be vested for achieving the Achieved Fiscal Year shall include the percentage of your Option for such Missed Fiscal Year.  If the percentage of your Option for any Missed Fiscal Year is vested in accordance with this paragraph 3(b), such fiscal year shall no longer be deemed to be a Missed Fiscal Year.  Notwithstanding anything set forth herein to the contrary, in no event shall the aggregate amount of your Option to be vested exceed the amount of Units subject to the Option granted hereunder.

    (c)    The portion of your Option which has become vested are referred to herein as "<u>Vested Options</u>" and all other portions of your Option are referred to herein as "<u>Unvested Options</u>." Any Unvested Options held by you at the time of a Sale of the Company (excluding the Unvested Options that shall become Vested Options in connection with such Sale of the Company in accordance

-4-

with this paragraph 3(c)) shall expire and be forfeited, unless otherwise determined by the Committee or the Board in its sole discretion. All Unvested Options held by you at the time of a Public Offering shall remain outstanding and be subject to the original vesting schedule set forth in paragraph 2(a) above.

(d)     Notwithstanding anything herein to the contrary, the Board may, in its sole discretion, accelerate the vesting of all or any portion of your Option at any time.

4.     Exercisability/Expiration of Option.

(a)     Your Option may be exercised in accordance with paragraph 5 only to the extent it has become vested pursuant to paragraph 3 above and has not expired and been forfeited pursuant to paragraph 4(b) below, and then only upon the earliest to occur of (a) the consummation of a Sale of the Company, (b) a Public Offering, (c) the date you become subject to any Disability, (d) the date of your death, (e) the date your employment with the Company terminates other than as the result of (i) the termination of your employment for Cause or (ii) your resignation, and (f) the Expiration Date.

(b)     Your Option shall expire and be forfeited to the extent that you do not exercise it on or before the earlier of (i) March 15 of the calendar year immediately following the calendar year in which the earliest of the events or dates set forth in paragraph 4(a) above occurs and (ii) the Expiration Date. Any portion of your Option that is not vested as of the date your employment with the Company terminates for any reason shall expire and be forfeited on such date and the number of Option Units with respect to which your Option may be exercised shall not increase once you cease to be employed by the Company. Your Option shall expire and be forfeited in its entirety (i) on the date your employment is terminated by reason of your resignation, (ii) on the date your employment is terminated for Cause at any time, or (iii) immediately following a Sale of the Company to the extent you do not exercise your Option on (or, if your Option previously became exercisable, prior to) the date of the Sale of the Company.

5.     Procedure for Exercise. You may exercise all or any portion of your Option, to the extent it has vested pursuant to paragraph 3 above and is exercisable pursuant to paragraph 4 above, at any time and from time to time prior to its expiration, by delivering written notice to the Company (to the attention of the Company's Secretary) and your written acknowledgement that you have reviewed and have been afforded an opportunity to ask questions of management of the Company with respect to all financial and other information provided to you regarding the Company, together with payment of the Option Price in accordance with the provisions of paragraph 2(b) above. As a condition to any exercise of your Option, you shall (a) permit the Company to deliver to you all financial and other information regarding the Company it believes necessary to enable you to make an informed investment decision, (b) make all customary investment representations which the Company requires and (c) execute and deliver a joinder to the Limited Liability Company Agreement and thereby become a "Member" and a holder of "Management Units" thereunder.

6.     Securities Laws Restrictions and Other Restrictions on Transfer of Option Units. You represent and warrant that when you exercise your Option you shall be purchasing Option Units for your own account and not on behalf of others. You understand and acknowledge that federal and state securities laws govern and restrict your right to offer, sell or otherwise dispose of any Option Units unless your offer, sale or other disposition thereof is registered or qualified under the Securities Act and applicable state securities laws, or in the opinion of the Company's counsel, such offer, sale or other disposition is exempt from registration or qualification thereunder. You agree that you shall not offer, sell or otherwise dispose of any Option Units in any manner which would: (i) require the Company to file any registration statement with the Securities and Exchange Commission (or any similar filing under state law) or to amend or supplement any such filing or (ii) violate or cause the Company to violate the

Securities Act, the rules and regulations promulgated thereunder or any other state or federal law. You further understand that the certificates for any Option Units you purchase shall bear such legends as the Company deems necessary or desirable in connection with the Securities Act or other rules, regulations or laws.

7.      Non-Transferability of Option.   Your Option is personal to you and is not transferable by you other than by will or the laws of descent and distribution. During your lifetime only you (or your guardian or legal representative) may exercise your Option. In the event of your death, your Option may be exercised only (i) by the executor or administrator of your estate or the person or persons to whom your rights under the Option shall pass by will or the laws of descent and distribution and (ii) to the extent that you were entitled to so exercise hereunder at the date of your death.

8.      Conformity with Plan.   Your Option is intended to conform in all respects with, and is subject to all applicable provisions of, the Plan (which is incorporated herein by reference). Inconsistencies between this Agreement and the Plan shall be resolved in accordance with the terms of the Plan. By executing and returning the enclosed copy of this Agreement, you acknowledge your receipt of this Agreement and the Plan and agree to be legally bound by all of the terms of this Agreement and the Plan.

9.      Rights of Participants.   Nothing in this Agreement shall interfere with or limit in any way the right of the Company to terminate your employment at any time (with or without Cause), nor confer upon you any right to continue in the employ of the Company for any period of time or to continue your present (or any other) rate of compensation, and in the event of your termination of employment (including, but not limited to, termination by the Company without Cause), any portion of your Option that was not previously vested and exercisable shall automatically expire and be forfeited. Nothing in this Agreement shall confer upon you any right to be selected again as a Plan participant, and nothing in the Plan or this Agreement shall provide for any adjustment to the number of Option Units subject to your Option upon the occurrence of subsequent events except as provided in paragraph 11 below. Prior to your exercise of your Option and the delivery to you of the Units represented thereby, you shall not have any rights as a holder of Units with respect to any Units covered by such Option (including any liquidation, redemption, dividend or voting rights).

10.     Withholding of Taxes.   The Company shall be entitled, if necessary or desirable, to withhold from you from any amounts due and payable by the Company to you (or secure payment from you in lieu of withholding) the amount of any minimum statutory withholding with respect to any Option Units issued or issuable under this Plan, and the Company may defer such issuance unless indemnified by you to its satisfaction.

11.     Adjustments.   In the event of a reorganization, recapitalization, unit dividend or unit split, or combination or other change in the Units or any merger, consolidation or exchange of Units, the Board or the Committee may make such adjustments in the number and type of units authorized by the Plan, the number and type of units covered by your Option (including the issuer thereof in the case of a merger, consolidation or exchange in which the surviving entity or a parent thereof assumes or replaces all or a portion of the outstanding Options) and the Exercise Price specified herein as may be determined to be appropriate and equitable, in order to prevent the dilution or enlargement of rights under your Option. The issuance by the Company of units of any class, or options or securities exercisable or convertible into units of any class, for cash or property, or for labor or services either upon direct sale, or upon the exercise of rights or warrants to subscribe therefor, or upon exercise or conversion of other securities, shall not affect, and no adjustment by reason thereof shall be made with respect to, the number or price of Units then subject to any Options.

-6-

12.    Right to Purchase Option Units Upon Your Termination of Employment.

(a)    Repurchase of Option Units.  If (i) your employment with the Company shall terminate (the "Termination") for any reason (or no reason), including upon your death, Disability, resignation or termination with or without Cause (the date on which such termination occurs being referred to as the "Termination Date"), or (ii) you violate any agreement between you and the Company with respect to non-solicitation, confidentiality, protection of trade secrets or the like, whether prior or subsequent to Termination of your employment with the Company, then, in any such case, the Company (or its designees) shall have the option to repurchase all or any part of the Option Units issued or issuable upon exercise of your Option, whether held by you or by one or more of your transferees, at the price determined in accordance with the provisions of paragraph 13 hereof (the "Repurchase Option").

(b)    Repurchase by Company.  The Company (or its designee) may elect to purchase all or any portion of the Option Units by delivery of written notice (the "Repurchase Notice") to you or any other holders of your Option Units (i) with respect to a repurchase right arising out of clause (i) of paragraph 12(a) above, within  six months after the Termination Date for any Option Units issued at least six months and one day prior to such Termination Date (or in the case of Option Units issued six months or less prior to such Termination Date or at any time after such Termination Date, no earlier than six months and one day and no later than nine months and one day after the date of the issuance of such Option Units), or (ii) with respect to a repurchase right arising out of clause (ii) of paragraph 12(a) above, within six months after the date such non-solicitation, confidentiality, protection of trade secret or similar provision expires (the period referred to in the foregoing clause (i) and (ii), as applicable,  the "Repurchase Notice Period").  The Repurchase Notice shall set forth the number of Option Units to be acquired from you and such other holder(s), the aggregate consideration to be paid for such Option Units and the time and place for the closing of the transaction.  The number of Option Units to be repurchased by the Company shall first be satisfied to the extent possible from the Option Units held by you at the time of delivery of the Repurchase Notice.  If the number of Option Units then held by you is less than the total number of Option Units the Company has elected to purchase, then the Company shall purchase the remaining Option Units elected to be purchased from the other holders thereof, pro rata according to the number of Option Units held by each such holder at the time of delivery of such Repurchase Notice (determined as close as practical to the nearest whole Unit).  The Company may assign its rights set forth in this paragraph 12 to any Person.

(c)    Repurchase by Investors.  If for any reason the Company does not elect to purchase all of the Option Units pursuant to the Repurchase Option, then OGF (or any designees thereof) shall be entitled to exercise the Company's Repurchase Option in the manner set forth in paragraph 12(a) for all or any portion of the number of Option Units the Company has not elected to purchase (the "Available Units").  As soon as practicable after the Company has determined that there shall be Available Units, but in any event within 45 days prior to the expiration of the Repurchase Notice Period referred to in paragraph 12(b) above, the Company shall deliver written notice (the "Option Notice") to OGF setting forth the number of Available Units and the price for each Available Unit. Notwithstanding any provision to the contrary, OGF shall not be permitted to exercise the Company's Repurchase Option until and to the extent that such Repurchase Option becomes exercisable by the Company pursuant to paragraph 12(b) above.  OGF may elect to purchase any number of Available Units by delivering written notice to the Company within 30 days after receipt of the Option Notice from the Company.  As soon as practicable, and in any event within five days after the expiration of such 30-day period, the Company shall notify you and any other holder(s) of Option Units as to the number of Option Units being purchased from you by OGF (the "Supplemental Repurchase Notice").  At the time the Company delivers the Supplemental Repurchase Notice to you, the Company shall also deliver written notice to OGF setting forth the number of Units OGF is entitled to purchase, the aggregate purchase price and the time

-7-

and place of the closing of the transaction. OGF may assign its rights set forth in this paragraph 12 to any Persons.

(d)    Closing of Repurchase of Option Units. The closing of the purchase of Option Units pursuant to this paragraph 12 shall take place on the date designated by the Company in the Repurchase Notice or Supplemental Repurchase Notice, as the case may be, which date shall not be more than 60 days nor less than five days after the delivery of the later of either such notice to be delivered. At the closing, the purchaser or purchasers shall pay the purchase price in the manner specified in paragraph 13(b) and you and any other holders of Option Units being purchased shall deliver the certificate or certificates representing such Option Units to the purchaser or purchasers or their nominees, accompanied by duly executed unit powers. Any purchaser of Option Units under this paragraph 12 shall be entitled to (i) receive customary representations and warranties from you and any other selling holders of Option Units regarding the sale of such Option Units (including representations and warranties regarding good title to such Option Units, free and clear of any liens or encumbrances) and (ii) require that signatures be guaranteed by a national bank or reputable securities broker.

(e)    Deemed Repurchase. Upon delivery of the Repurchase Notice or Supplemental Repurchase Notice, as applicable, then from and after such time, the holder of such Option Units from whom such securities are to be purchased shall cease to have any rights as a holder of such securities (other than the right to receive payment of such consideration in accordance with paragraph 13 below), and such securities shall be deemed purchased in accordance with the applicable provisions hereof and the purchaser thereof shall be deemed the owner (of record and beneficially) and holder(s) of such securities, whether or not the certificate representing such Option Units has been delivered as required by this Agreement.

(f)    Revocation of Election. Any election by the Company or OGF (or any of their designees) to purchase Option Units pursuant to this paragraph 12 shall be revocable by such Person (with respect to all or any portion of the Option Units elected to be purchased) at any time prior to the closing of such purchase, without any liability whatsoever to such Person in respect of the rights and obligations in this paragraph 12.

13.    Purchase Price for Option Units.

(a)    Purchase Price. In the event that (i) your Termination is effected by a termination of your employment for Cause or (ii) prior to the consummation of any repurchase, you violate any agreement between you and the Company with respect to non-solicitation, confidentiality, protection of trade secrets or the like, the purchase price for each Option Unit shall be the lesser of (1) the exercise price paid by you for such Option Unit and (2) the Fair Market Value thereof as of the Termination Date. Other than as described in the preceding sentence, the purchase price for each Option Unit shall be the Fair Market Value thereof as of the Termination Date; provided, however, that if you receive a repurchase price per Option Unit equal to the Fair Market Value thereof pursuant to this sentence but subsequently violate any agreement between you and the Company with respect to non-solicitation, confidentiality, protection of trade secrets or the like, then you shall immediately remit a cash payment to the Company equal in amount to the positive difference, if applicable, between the Fair Market Value received by you per each such Option Unit and the corresponding exercise price paid by you for each such Option Unit.

(b)    Manner of Payment. If the Company elects to purchase all or any part of the Option Units, including Option Units held by one or more transferees, the Company shall pay for such Option Units by certified check or wire transfer of funds to the extent such payment would not cause the

-8-

Company to violate the General Corporation Law of the State of Delaware and would not cause the Company to breach any agreement to which it is a party relating to the indebtedness for borrowed money or other material agreement (including any restricted payment covenant prohibiting direct or indirect distributions to the Company in order to effectuate such repurchase) (each such restriction, a "Restrictive Covenant"). If any such Restrictive Covenants prohibit the repurchase of Option Units hereunder which the Company is otherwise entitled to make, the time periods provided in this paragraph 13 shall be suspended, and the Company may make such repurchases as soon as it is permitted to do so under such restrictions. In addition, if any such Restrictive Covenant prohibits the repurchase of Option Units hereunder with a cashier's or certified check or wire transfer of funds, then the Company may make such repurchase of Option Units with a three-year junior subordinated note payable on maturity bearing interest (payable at maturity) at a simple rate per annum equal to the Base Rate (a "Junior Subordinated Note"). Any Junior Subordinated Note issued by the Company pursuant to this paragraph 13(b) shall be subject to any Restrictive Covenants and any subordination provisions required by the Company's senior and subordinated lenders and may be prepaid without premium or penalty at the election of the Company to the extent permitted by the Company's loan agreements and related documents with the Company's senior and subordinated lenders. In addition, the Company may pay the purchase price for such Option Units by offsetting amounts outstanding under any indebtedness or obligations owed by you to the Company. If OGF (or its designees) elects to purchase all or any portion of the Available Units, OGF (or its designees) shall pay for that portion of such Option Units by certified check or wire transfer of funds.

      14.    Restrictions on Transfer.

      (a)    Transfer of Option Units. You shall not sell, pledge or otherwise transfer any interest in any Option Units except pursuant to a Public Sale or the provisions of paragraph 12 hereof or as otherwise permitted pursuant to the terms of the Limited Liability Company Agreement ("Exempt Transfers") and except pursuant to the provisions of this paragraph 14. Prior to transferring any interest in any Option Units (other than a Public Sale) to any Person, you shall cause the prospective transferee to be bound by this Agreement and to execute and deliver to the Company and OGF a counterpart of this Agreement.

      (b)    Termination of Restrictions. The restrictions on the transfer of Option Units set forth in this paragraph 14 shall terminate when the Company has sold Units pursuant to a Public Offering.

      15.  Confidential Information. You acknowledge that the Confidential Information is the property of the Company or such Subsidiary. Therefore, you agree that you shall not disclose to any person or entity or use for any purpose (other than for the benefit of the Company and its Subsidiaries) any Confidential Information or any confidential or proprietary information of other persons or entities in the possession of the Company and its Subsidiaries ("Third Party Information"), without the prior written consent of the Board, unless and to the extent that the Confidential Information or Third Party Information becomes generally known to and available for use by the public other than as a result of your acts or omissions. You shall deliver to the Company at the termination or expiration of the Employment Period (as defined below), or at any other time the Company may request, all memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documents and data (and copies thereof) embodying or relating to the Confidential Information, Work Product or the business of the Company or any Subsidiary which you may then possess or have under your control.

      16.    Non-Compete; Non-Solicitation.

(a)     You hereby acknowledges that, during the course of your employment with the Company you have and shall become familiar with the Company's and its Subsidiaries' trade secrets and other Confidential Information. You acknowledge and agree that the Company and its Subsidiaries would be irreparably damaged if you were to provide services to or otherwise participate in the business of any person or entity competing with the Company or its Subsidiaries or providing services similar to those of the Company and its Subsidiaries and that any such competition or provision of services by you would result in a significant loss of goodwill by the Company and its Subsidiaries.  You further acknowledge and agree that the covenants and agreements set forth in this paragraph 16 were a material inducement to the Company to enter into this Agreement and to perform its obligations hereunder, and that the Company would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the parties hereto if you breached the provisions of this paragraph 16. Therefore, you agree that, during the term of your employment with the Company and its Subsidiaries (the "Employment Period") and for 12 months thereafter (the "Noncompete Period"), you shall not directly or indirectly own any interest in, manage, control, participate in (whether as an officer, director, employee, partner, agent, representative or otherwise), consult with, render services for, or in any other manner engage in any business competing with the businesses of the Company or its Subsidiaries, as such businesses exist or are or were in the process of being developed during the Employment Period within any geographical area in which the Company or its Subsidiaries engage or plan to engage in such businesses.  Nothing herein shall prohibit you from being a passive owner of not more than 2% of the outstanding stock of any class of a corporation which is publicly traded so long as you do not have any active participation in the business of such corporation.

(b)     During the Noncompete Period, you shall not directly or indirectly through another person or entity (i) induce or attempt to induce any employee of the Company or any Subsidiary to leave the employ of the Company or such Subsidiary, or in any way interfere with the relationship between the Company or any Subsidiary and any employee thereof, (ii) hire any person who was an employee of the Company or any Subsidiary at any time during the six month period prior to the date of hire, (iii) call on, solicit, or service any customer, supplier, licensee, licensor or other business relation or prospective client of the Company or any of its Subsidiaries with respect to products and/or services that are or have been provided by the Company or such Subsidiary during the twelve-month period prior to the termination of the Employment Period, or which the Company or any of its Subsidiaries is currently in the process of developing or (iv) induce or attempt to induce any customer, supplier, licensee, licensor, franchisee or other business relation of the Company or any Subsidiary to cease doing (or reduce its) business with the Company or such Subsidiary, or in any way interfere with the relationship between any such customer, supplier, licensee or business relation and the Company or any Subsidiary (including, without limitation, making any negative or disparaging statements or communications regarding the Company or its Subsidiaries).

(c)     In addition to the other remedies available hereunder, in the event of a breach or violation by you of this paragraph 16, the Noncompete Period shall be automatically extended by the amount of time between the initial occurrence of the breach or violation and when such breach or violation has been duly cured. You acknowledge that the restrictions contained in this paragraph 16 are reasonable and that you have reviewed the provisions of this Agreement with your legal counsel.  You acknowledge and agree that the covenants contained in this paragraph 16 are in addition to, rather than in lieu of, any similar or related covenants to which you are a party or by which you are bound.

(d)     You agree that you shall not, at any time, whether during or after you cease to provide services to the Company or any of its Subsidiaries, make or publish any untruthful statement (orally or in writing) that intentionally libels, slanders, disparages or otherwise defaces the goodwill or reputation (whether or not such disparagement legally constitutes libel or slander) of the Company, any

Subsidiary or any of their affiliates, or its other officers, managers, directors, partners or investment professionals. You acknowledges that you, as part of his employment, are responsible for preserving the goodwill or reputation of the aforementioned parties.

17.     Additional Restrictions on Transfer.

(a)     Restrictive Legend.  The certificates representing the Option Units shall bear a legend of the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [_____, 20___], HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR UNDER ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN EXEMPTION FROM REGISTRATION THEREUNDER.  THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER, CERTAIN REPURCHASE OPTIONS AND CERTAIN OTHER AGREEMENTS SET FORTH IN AN OPTION AGREEMENT BETWEEN THE COMPANY AND [_____], DATED AS OF [_____, 20__], A COPY OF WHICH MAY BE OBTAINED BY THE HOLDER HEREOF AT THE COMPANY'S PRINCIPAL PLACE OF BUSINESS WITHOUT CHARGE."

(b)     Opinion of Counsel.  You may not sell, transfer or dispose of any Option Units (except pursuant to an effective registration statement under the Securities Act) without first delivering to the Company an opinion of counsel reasonably acceptable in form and substance to the Company that registration under the Securities Act or any applicable state securities law is not required in connection with such transfer.

(c)     Holdback.  You agree not to effect any public sale or distribution of any equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, during the seven days prior to and the 180 days after the effectiveness of any Public Offering, except as part of such Public Offering if otherwise permitted by the Company.

18.     Management Units.  You acknowledge and agree that your Option Units shall be deemed to be Management Units for all purposes of the Limited Liability Company Agreement (including Article 15) and, as such, shall be subject to the provisions thereof.

19.     Remedies.   The parties hereto (and OGF as a third-party beneficiary) acknowledge and agree that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that the parties hereto (and OGF as a third-party beneficiary) shall be entitled to specific performance and/or injunctive relief (without posting bond or other security) from any court of law or equity of competent jurisdiction in order to enforce or prevent any violation of the provisions of this Agreement.

20.     Amendment.  Except as otherwise provided herein and notwithstanding anything to the contrary in the Plan, any provision of this Agreement may be amended or waived only with the prior written consent of the Company and the Plan participants who have been granted options to purchase a majority of the options under the Plan (based on the number of underlying Option Units issuable upon the exercise of all such options) theretofore granted under the Plan (unless you will be

-11-

treated in a manner materially different from other Plan participants, in which case your individual written consent will also be required); provided that no provision of paragraphs 12 through this paragraph 20 may be amended or waived without the prior written consent of OGF. Notwithstanding any other provisions of the Plan, and in addition to the powers of amendment and modification set forth herein, the provisions hereof and the provisions of any Option granted hereunder may be amended unilaterally by the Committee from time to time (but shall have no obligation to do so) to the extent necessary (and only to the extent necessary) to prevent the implementation, application or existence (as the case may be) of any such provision from causing any Option granted hereunder to be treated as providing for the deferral of compensation pursuant to Code §409A subject to federal income tax by reason of Code §409A(a)(1)(A).

      21.    Successors and Assigns. Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns.

      22.    Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

      23.    Counterparts. This Agreement may be executed in one or more counterparts (including by means of telecopied signature pages), each of which shall be an original and all of which taken together shall constitute one and the same agreement.

      24.    Descriptive Headings. The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

      25.    Governing Law. All issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

      26.    Notices. All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when personally delivered, sent by telecopy (with receipt confirmed) on a business day during regular business hours of the recipient (or, if not, on the next succeeding business day) or one business day after sent by reputable overnight express courier (charges prepaid). Such notices, demands and other communications shall be sent to you at the address on file with the Company and to the Company and OGF at the addresses listed below:

If to the Company:

Phoenix Services International LLC
148 West State Street, Suite #301
Kennett Square, PA 19348
Attn:   John Hilbert, Chief Financial Officer

Telecopy:  (610) 347-0443

With a copy to (which shall not constitute notice to the Company):

OGF AIS Holdings Corp.
c/o Olympus Growth Fund V, L.P.
Metro center, One Station Place
Stamford, CT 06902
Telephone:  (203) 353-5900
Facsimile:  (203) 353-5910
Attn:    L. David Cardenas
         Mike Horgan

Kirkland & Ellis LLP
300 N. LaSalle St.
Chicago, Illinois 60654
Attn:    John A. Schoenfeld, P.C.
         Benjamin P. Clinger
Telephone:    (312) 862-2000
Telecopy:     (312) 862-2200


If to OGF:

OGF AIS Holdings Corp.
c/o Olympus Growth Fund V, L.P.
Metro center, One Station Place
Stamford, CT 06902
Telephone:  (203) 353-5900
Facsimile:  (203) 353-5910
Attn:    L. David Cardenas
         Mike Horgan

With a copy to (which shall not constitute notice to OGF):

Kirkland & Ellis LLP
300 N. LaSalle St.
Chicago, Illinois 60654
Attn:    John A. Schoenfeld, P.C.
         Benjamin P. Clinger
Telephone:    (312) 862-2000
Telecopy:     (312) 862-2200

or to such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party.

27.    Third-Party Beneficiary.  The Company and you acknowledge that OGF is a third-party beneficiary under this Agreement.

-13-

28.   <u>Entire Agreement</u>.   Except as otherwise expressly set forth herein, this Agreement and the Plan embody the complete agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.   If there are any conflicts in terms and conditions between this Agreement and the Plan, the terms and conditions of the Plan shall govern, unless otherwise determined by the Committee or the Board.

29.   <u>Rule 701 Compensation</u>.   The Company and you acknowledge and agree that this Agreement has been executed and delivered, and the Option has been granted hereunder, in connection with and as a part of the compensation and incentive arrangements between the Company and you and not as part of a capital raising effort of the Company.   The grant of the Option hereunder and any issuance of Option Units upon the exercise of the Option are intended to qualify as an exempt offering under Rule 701 of the Securities Act.

30.   <u>Code Section 280G</u>.   Notwithstanding any provision of this Agreement to the contrary, if all or any portion of the payments or benefits received or realized by you pursuant to this Agreement either alone or together with other payments or benefits which you receive or realize or are then entitled to receive or realize from the Company or any of its affiliates would constitute a "parachute payment" within the meaning of Section 280G of the Code and the regulations promulgated thereunder or any corresponding and applicable state law provision, such payments or benefits provided to you shall be reduced by reducing the amount of payments or benefits payable to you pursuant to paragraphs 3 and 4 of this Agreement to the extent necessary so that no portion of such payments or benefits shall be subject to the excise tax imposed by Section 4999 of the Code and any corresponding and/or applicable state law provision; <u>provided</u> <u>that</u> such reduction shall only be made if, by reason of such reduction, your net after tax benefit shall exceed the net after tax benefit if such reduction were not made.   For purposes of this paragraph, "<u>net after tax benefit</u>" shall mean the sum of (i) the total amount received or realized by you pursuant to this Agreement that would (in the absence of any reduction contemplated by this paragraph 30) constitute a "parachute payment" within the meaning of Section 280G of the Code and any corresponding and applicable state law provision, plus (ii) any other payments or benefits which you receive or realize or are then entitled to receive or realize from the Company and any of its affiliates that would (in the absence of any reduction contemplated by this paragraph 30) constitute a "parachute payment" within the meaning of Section 280G of the Code and any corresponding and applicable state law provision, less (iii) the amount of federal or state income taxes payable with respect to the payments or benefits described in (i) and (ii) above calculated at the maximum marginal individual income tax rate for each year in which payments or benefits shall be realized by you (based upon the rate in effect for such year as set forth in the Code, and any corresponding applicable state law provisions at the time of the first receipt or realization of the foregoing), less (iv) the amount of excise taxes imposed with respect to the payments or benefits described in (i) and (ii) above by Section 4999 of the Code and any corresponding and applicable state law provision.

31.   <u>Code Section 409A</u>.

(a)   The Options issued hereunder are intended to qualify as an arrangement that does not constitute "deferred compensation" for purposes of Code §409A(a) by reason of the exception for "short-term deferrals" set forth in Section 1.409A-1(b)(4) of the Treasury Regulations (except that any "transaction-based" payments to which you become entitled pursuant to paragraph 32(b) below are intended to constitute deferred compensation that is not subject to federal income tax pursuant to Code §409A(a)(1)(A)), and the terms of this Agreement shall be interpreted in a manner consistent with such intention.   However, neither the Company nor any of its affiliates makes any representations with respect

to the application of Code §409A to the Options and, by the acceptance of the Options, the Participant agrees to accept the potential application of Code §409A to the Options and the other tax consequences of the issuance, vesting, ownership, modification, adjustment, and disposition of the Options.  The Participant agrees to hold harmless and indemnify the Company and its affiliates from any adverse tax consequences to the Participant with respect to the Options, any withholding or other tax obligations of the Company or its affiliates with respect to the Options, and from any action or inaction or omission of the Company or its affiliates pursuant to the Plan or otherwise that may cause such Options to be or become subject to federal income tax pursuant to Code §409A(a)(1)(A).

(b)     To the extent that you exercise your Options in connection with the Sale of the Company and, a consequence thereof, would (in the absence of this paragraph 32(b)) become entitled to one or more payments after the date such Sale of the Company that are treated as compensation for federal income tax purposes ("transaction-based compensation"), then you shall be entitled to receive such transaction based compensation only to the extent (a) it is paid on the same schedule and under the same terms and conditions (i) as apply to payments to holders of Company Units generally with respect to such Units pursuant to a Sale of the Company structured as a sale of Units that meets the requirements of Section 1.409A-3(i)(5)(v) of the Treasury Regulations or (ii) as apply to payments to the Company pursuant to a sale of the Company's assets that meets the requirements of Section 1.409A-3(i)(5)(vii) of the Treasury Regulations, and (b) the transaction-based compensation is paid not later than five years after the date the Sale of the Company is consummated.  Each such payment shall be deemed to be a separate payment for purposes of Code §409A.

(c)     For purposes of this Agreement, "termination of employment," "cease to be employed" or similar phrases shall have the meaning for "termination of employment" set forth in the first sentence of Section 1.409A-1(h)(i)(ii) of the Treasury Regulations.

32.     <u>No Strict Construction</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

33.     <u>Further Assurances</u>.  At any time or from time to time after the date hereof, the parties agree to cooperate with each other, and at the request of any other party, to execute and deliver any further instruments or documents and to take all such further action as the other party may reasonably request in order to evidence or effectuate the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the parties hereunder.

34.     <u>Business Days</u>.  If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the state in which the Company's chief executive office is located, the time period shall automatically be extended to the business day immediately following such Saturday, Sunday or legal holiday.

35.     <u>Delivery by Facsimile</u>.  This Agreement and any signed agreement or instrument entered into in connection herewith or contemplated hereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or

instrument shall raise the use of a facsimile machine to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine as a defense to the formation of a contract and each such party forever waives any such defense.

*    *    *    *    *

Please execute the extra copy of this Option Agreement in the space on the following page and return it to the Company's Secretary at its executive offices to confirm your understanding and acceptance of the agreements contained in this Option Agreement.

Very truly yours,

PHOENIX SERVICES INTERNATIONAL, LLC

By: _____

Name:   John Hilbert
Title:    Chief Financial Officer

Enclosures:    (1)    Extra copy of this Option Agreement
               (2)    Copy of the Plan

*[Company Signature Page to Option Agreement]*

The undersigned hereby acknowledges having read this Option Agreement and the Plan and hereby agrees to be bound by all provisions set forth herein and in the Plan.

Dated as of May ⟶ 6, 2014

PARTICIPANT

Name:  Stan Ben

### Terms of Option Agreement

Participant:        Stan Ben

Number of Units:    10,000

Exercise Price:     $30.68

### CONSENT

The undersigned spouse of Participant hereby acknowledges that I have read the foregoing Option Agreement and that I understand its contents.  I am aware that the Option Agreement provides for the repurchase of my spouse's Option Units under certain circumstances and imposes other restrictions on the transfer of such Option Units.  I agree that my spouse's interest in the Option Units is subject to this Option Agreement and any interest I may have in such Option Units shall be irrevocably bound by this Option Agreement and further that my community property interest, if any, shall be similarly bound by this Option Agreement.  I am aware that the legal, financial and other matters contained in this Option Agreement are complex and I am free to seek advice with respect thereto from independent counsel.  I have either sought such advice or determined after carefully reviewing this Option Agreement that I will waive such right.

Spouse

Witness

*[Participant Signature Page to Option Agreement]*

# EXHIBIT D

## EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement"), dated December 31, 2014, is by and between METAL SERVICES LLC d/b/a PHOENIX SERVICES, a Delaware limited liability company (the "Employer"), PHOENIX SERVICES INTERNATIONAL LLC, a Delaware limited liability company ("PSI LLC"), and STAN BEN, a resident of the State of Florida ("Employee") (collectively the "Parties").

## RECITALS

WHEREAS, as provided in the Fourth Amended and Restated Limited Liability Company Agreement of PSI LLC, dated as of April 16, 2010 (the "LLC Agreement"), PSI LLC is managed by a Board of Managers (the "Board");

WHEREAS, Employer and Employee desire Employee to provide professional services to Employer;

WHEREAS, Employee is currently serving as Senior Vice President Operations Europe and Africa of Employer and the Board and Employer now desire to have Employee serve, at the discretion of the Board, as President of Europe and Africa of Employer;

WHEREAS, Employer desires to continue to employ Employee and Employee desires to continue employment with Employer, subject in all respects to the terms and conditions set forth in this Agreement; and

WHEREAS, the Parties intend that this Agreement will supersede and replace in its entirety that certain Employment Agreement, dated April 16, 2013, by and between PSI LLC and Employee.

NOW THEREFORE, in exchange for the Parties' mutual covenants, conditions and terms set forth herein and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## AGREEMENTS

1.  **Employment and Duties**.

    (a)   Employment.  Employer shall continue to employ Employee, and, for so long as PSI LLC and Phoenix Services desire the services of Employee, Employee shall serve as President of Europe and Africa of Employer. Employee hereby agrees to continue Employee's employment on the terms and conditions contained herein and agrees to devote substantially all of Employee's commercial efforts to promote and further the business and interests of Employer and PSI LLC and their subsidiaries. The foregoing limitations shall not be construed to prohibit Employee from making personal investments or engaging in civic activities that do not impair Employee's ability to carry out Employee's duties hereunder. The duties of Employee hereunder will be those assigned to Employee from



time to time by the chief executive officer of Employer (the "CEO"), your direct supervisor or other designee determined by the Board.

(b)  Policies.  Employee shall faithfully adhere to, execute and fulfill all lawful policies established by Employer

(c)  Compensation.  For all services rendered by Employee, the Employer shall pay Employee a base salary of $259,240.00 per annum (which amount is consistent with Employee's salary immediately prior to the execution of this Agreement) (the "Annual Base Salary").  Employee's Annual Base Salary (x) will be reviewed not less often than annually and may be adjusted by the CEO with the Board's prior written approval based on Employee's position, responsibilities and performance and (y) will be payable in accordance with the Employer's payroll procedures for salaried employees, but not less frequently than monthly.

(d)  Additional Compensation.  Employee shall have the use, at Employer's expense, of a car for the performance of his duties with Employer, as well as for a reasonable amount of personal use outside of working hours. Employee shall also have available the ability to participate in Employer's plans for life, medical, dental, health and disability insurance benefits for Employee as well as Employee's dependents.  Employee will also be eligible to participate in Phoenix Services' 401(k) savings plan, as in effect as of the date hereof.  Employee will also be entitled to participate in the Supplemental Executive Retirement Plan of Phoenix Services, dated December 31, 2014.

(e)  Bonus.  Employee shall be eligible during the Term to earn an annual bonus based on the performance of Employer and its Subsidiaries against budgeted financial metrics (such as EBITDA, revenue, etc.) and Employee's performance against personal objectives, in each case, as determined by the Board on an annual basis in consultation with the CEO and Employee.  Any bonus payable to Employee pursuant to this Agreement (x) shall be paid in full no later than March 15 of the fiscal year following the end of the fiscal year in which the bonus was earned by Employee and (y) shall be payable to Employee if (and only if) Employee has been continuously employed by or on behalf of Employer through the date of such payment.

(f)  Paid Vacation.  Employee shall be entitled to twenty (20) paid vacation days per year during the Term of this Agreement.  Employee shall also be entitled to all paid holidays in accordance with the Employer's policy with respect to such holidays for salaried employees.

(g)  Transaction Bonus.  In further consideration of the covenants set forth in this Agreement, you are eligible to receive a transaction bonus in connection with the sale of PSI LLC or Employer pursuant to the terms



2

and conditions set forth in the Transaction Bonus Letter Agreement attached hereto as <u>Exhibit A</u>.

2.   **<u>Term; Termination; Rights on Termination</u>.**

(a)   <u>Term</u>. The Term of this Agreement (the "<u>Term</u>") shall begin on the date of this Agreement and shall continue until the third anniversary hereof; provided that such Term shall automatically renew for consecutive one-year periods on each subsequent anniversary of the date of this Agreement unless written notice is provided by either Employee (to Employer) or the Employer (to Employee), in each case, not later than sixty (60) days prior to the expiration of the initial three-year Term or any renewal period.

(b)   <u>Termination</u>. Notwithstanding anything to the contrary in paragraph 2(a), the employment relationship hereunder is at-will and this Agreement may be terminated prior to the expiration of the Term (or at any time during any renewal period thereof) in any one of the following ways:

 i.   <u>Death.</u> The death of Employee shall immediately terminate this Agreement with no severance compensation due Employee's estate.

 ii.   <u>Disability.</u> If Employee becomes entitled to receive benefits under an insured long-term disability plan of the Employer or any of its affiliates that includes its officers, or if Employee is no longer able to perform the duties and responsibilities of Employee's position due to illness, accident or other physical or mental condition and such disability is expected to continue with or without interruption for a period of one hundred eighty (180) days or longer, the Employer may, as directed by the Board terminate Employee's employment hereunder after the aforementioned one hundred eighty day (180) period expires with no severance compensation due Employee.

 iii.   <u>By Employer with Cause.</u> The Employer may, as directed by the Board, terminate this Agreement and Employee's employment upon written notice for "<u>Cause</u>" which shall be (1) Employee's willful breach or attempted breach of this Agreement; (2) Employee's negligence in the performance or intentional nonperformance of any of Employee's material duties and responsibilities hereunder; (3) Employee's dishonesty or fraud with respect to the business, reputation or affairs of PSI LLC, Employer, their subsidiaries or any of their affiliates; or (4) Employee's conviction of a felony crime or conviction for a crime which bears on Employee's honesty as determined by the Board in its sole discretion. In the event Employee is terminated for Cause, no severance compensation will be paid.



3

iv.   <u>By Employer without Cause.</u>  Employee may be terminated without Cause by Employer, as directed by the Board, effective upon written notice to Employee.  Should Employee be terminated for any reason except for "Cause" as enumerated in Subsection iii above, Employee shall receive from Employer, payable periodically after termination in accordance with the payroll schedule of the Employer applicable to Employee at the time of termination of Employee's employment with the Employer, Employee's Annual Base Salary (at the rate then in effect prior to any reduction in compensation which would constitute Good Reason hereunder) during the twelve (12) months after the date of termination.  If Employee is terminated without Cause, Employer will also, during the twelve (12) month period after Employee is terminated without Cause, arrange at Employer's expense to provide the Employee and Employee's dependents with medical, dental and health insurance benefits at least equal, in type and level of coverage, to those which Employee and Employee's dependents were receiving immediately prior to the termination without Cause, provided that if such obligations would result in Employer incurring any liabilities under Section 4980D of the Internal Revenue Code or similar applicable laws, then Employer shall not be obligated to provide such benefits and Employer and Employee shall negotiate a reasonable solution in respect thereof.  Nothing in this subsection shall be construed as limiting or interfering with any other rights of Employee with respect to Employer and any of its affiliates under any other Agreements executed by and between Employer and any of its affiliates.

v.   <u>By Employee with Good Reason.</u>  Employee may resign his employment for "<u>Good Reason</u>" which shall be (A) a material diminishment is made by Employer in Employee's responsibilities or titles without Employee's consent, (B) a reduction is made by Employer in either Employee's (x) Annual Base Salary or (y) maximum annual bonus opportunity (it being understood that a failure by Employee to earn the maximum available bonus as determined by the Board shall not constitute Good Reason), (C) Employer intentionally and materially violates any of its obligations contained in paragraph 1, or (D) Employer, without the consent of Employee, relocates the Employee's principal work location to more than 50 miles from its present location; provided that, in order for an event to constitute a termination with Good Reason, Employee must provide to Employer a written notice detailing the specific circumstances alleged to constitute Good Reason within thirty (30) days after Employee first becomes aware of the circumstances and allow Employer thirty (30) days to cure such circumstances.

4



If Employee terminates Employee's employment for Good Reason, Employee shall receive from Employer, upon Employee providing Employer with thirty (30) days written notice, payable periodically after termination in accordance with the payroll schedule of the Employer applicable to Employee at the time of termination of Employee's employment with the Employer, Employee's Annual Base Salary (at the rate then in effect prior to any reduction in compensation which would constitute Good Reason hereunder) during the twelve (12) months after the date of termination. If Employee terminates Employee's employment for Good Reason, Employer will also, during the twelve (12) month period after the Employee terminates Employee's employment for Good Reason, arrange at Employer's expense to provide the Employee and Employee's dependents with medical, dental and health insurance benefits at least equal, in type and level of coverage, to those which Employee and Employee's dependents were receiving immediately prior to the termination for Good Reason, provided that if such obligations would result in Employer incurring any liabilities under Section 4980D of the Internal Revenue Code or similar applicable laws, then Employer shall not be obligated to provide such benefits and Employer and Employee shall negotiate a reasonable solution in respect thereof. Nothing in this subsection shall be construed as limiting or interfering with any other rights of Employee with respect to Employer and any of its affiliates under any other Agreements executed by and between Employer and any of its affiliates.

vi.   <u>By Employee without Good Reason</u>.  If the Employee terminates Employee's employment other than for Good Reason upon Employee providing Employer with sixty (60) days written notice, Employee will be entitled to any Annual Base Salary not paid as of the date of termination.  In the event Employee terminates Employee's employment other than for Good Reason upon Employee providing Employer with sixty (60) days written notice, no severance compensation will be paid.

(c)   <u>Change in Control</u>.

i.   If a Change in Control shall occur during the Term of this Agreement, then this Agreement shall be effective and shall continue until the later of (x) the third anniversary of the date hereof (i.e., the expiration of the initial three-year Term) and (y) the second anniversary of such Change in Control, subject to any earlier termination pursuant to paragraph 2(b).

ii.   "<u>Change in Control</u>" shall be defined as any one of the following:



5

1.    a transaction whereby an unaffiliated third person or entity acquires more than 50% of the voting securities of PSI LLC (including by acquiring the shares of OGF AIS Holdings Corp.) and OGF AIS Holdings Corp. and its affiliates no longer have the right to appoint a majority of the managers to the Board;

2.    a merger or consolidation of PSI LLC in which the members of PSI LLC immediately prior to such transaction would own, in the aggregate, less than 50% of the total combined membership interests of the surviving entity;

3.    a merger or consolidation of Employer in which the members of Employer immediately prior to such transaction would own, in the aggregate, less than 50% of the total combined membership interests of the surviving entity;

4.    the sale by PSI LLC of all or substantially all of the assets of PSI LLC in one transaction or in a series of related transactions;

5.    the sale by Employer of all or substantially all of the assets of Employer in one transaction or in a series of related transactions;

6.    the liquidation or complete dissolution of the PSI LLC; or

7.    the liquidation or complete dissolution of Employer.

(d)   <u>Rights on Termination</u>. All other rights and obligations of the Employer and Employee under this Agreement shall cease as of the effective date of termination, except that Employee's obligations under paragraphs 3 through 12 shall survive such termination in accordance with their terms.

(e)   <u>Release</u>. Employee shall not be entitled to receive or retain any payments or other benefits pursuant to paragraph 2(b) unless Employee has executed and delivered to Employer a general release, the form of which is attached hereto as <u>Exhibit B</u>, and such general release is in full force and effect and has not been breached.

3.   **<u>Non-Competition; Confidentiality</u>.**

(a)   <u>Acknowledgement by Employee</u>. Employee acknowledges the following:

i.   The provisions of this paragraph 3 are in consideration for employment with Employer and that Employer's willingness to

6



enter into this Agreement is conditioned on Employee's undertaking the obligations of this paragraph 3.

ii. Employer and PSI LLC are engaged in the business of steel mill services and slag processing and sales (as conducted thereby, the "Business").

iii. Employer, PSI LLC and their affiliates are engaging in the Business within the Commonwealth of Pennsylvania and elsewhere. The Commonwealth of Pennsylvania and each location outside the Commonwealth where Employer and its affiliates are engaged in the Business is defined to be the "Territory" for purposes of this Agreement.

iv. Employee will have access to certain confidential and proprietary information concerning the Business ("Confidential Information"), which information is valuable, special and unique asset of Employer and its affiliates.

v. Unauthorized disclosure or use of the Confidential Information would irreparably harm PSI LLC, Employer and their affiliates.

(b) Agreement Not to Compete.

i. Employee covenants and agrees that during the Term and for a period of one (1) year following the termination of employment (the "Restricted Period"), Employee will not:

1. whether as employee, principal, agent, independent contractor, partner or otherwise, own, manage, operate, control, participate in, perform services for or otherwise carry on a business that is directly competitive with the Business anywhere in the Territory;

2. induce or attempt to persuade any employee, agent, customer or supplier of the Business, PSI LLC, Employer or any of their affiliates to terminate such employment, agency or business relationship, interfere with such employment, agency or business relationship or otherwise hire or cause to be hired any such person; or

3. call upon any prospective acquisition candidate, on Employee's own behalf or on behalf of any other business organization which candidate was, to Employee's knowledge, either contacted for the purpose of acquisitions discussions by PSI LLC, Employer or their affiliates or for which the PSI LLC, Employer or their affiliates has made an acquisition analysis for the purpose of acquiring such an



7

entity; provided, however, that nothing set forth in this paragraph 3 shall prohibit Employee from owning up to five percent (5%) of the outstanding stock of any corporation if such stock is publicly traded and listed on any national or regional stock exchange or on the NASDAQ market system.

(c) <u>Confidential Information.</u> Employee covenants and agrees that, both during the Term and after termination of this Agreement, Employee will not divulge or make use of any Confidential Information other than to use for the benefit of, or disclose such Confidential Information to, PSI LLC and Employer. This covenant shall apply to all Confidential Information, whether now known to Employee or later to become known to Employee.

(d) <u>Non-Disparagement</u>. Employee covenants and agrees that, both during the Term and after termination of this Agreement, Employee will not make any negative or disparaging statements or communications regarding Employer, PSI LLC or any of their respective Affiliates, any of their respective businesses, services or practices or any of their respective directors, managers, officers, agents, representatives or direct or indirect equityholders, in each case either orally or in writing.

(e) <u>Other Acknowledgements.</u> Employee further acknowledges and agrees:

   i. A breach by Employee of any of Employee's obligations under this paragraph 3 will cause PSI LLC, Employer or their affiliates immediate and irreparable harm for which PSI LLC, Employer or their affiliates not be adequately compensated for by money damages;

   ii. Apart from any other remedies provided in this Agreement, any of PSI LLC, Employer or any of their affiliates may proceed against Employee in law or in equity for such damages or other relief as a court may deem appropriate, and shall, in the event of any actual or threatened breach of this paragraph 3, be entitled to enforcement of Employee's covenants by restraining orders and injunctive relief, each without the necessity of posting a bond;

   iii. The covenants in this paragraph 3 impose a reasonable restraint on Employee in light of the scope of the Business and the proposed activities and business of PSI LLC, Employer or their affiliates on the date of the execution of this Agreement and the current plans of PSI LLC, Employer and their affiliates;

   iv. It is the intent of the parties to this Agreement that the covenants of the Employee contained in paragraph 3(b) with respect to the non-competition be construed and enforced in accordance with the



8